**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FIRST BANK AND TRUST COMPANY OF ILLINOIS, <br><br> Plaintiff, <br><br> v. <br><br> KENNETH E. RICHARDSON, and MICHAEL ANNECCA, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) |

FILED: SEPTEMBER 2, 2008
08CV4987
JUDGE NORDBERG
MAGISTRATE JUDGE ASHMAN
EDA
  Case No.

**COMPLAINT FOR BREACH OF GUARANTY CONTRACT**

Plaintiff First Bank and Trust Company of Illinois ("First Bank"), for its complaint against Kenneth E. Richardson ("Richardson"), and Michael Annecca ("Annecca") (collectively, the "Guarantors"), alleges as follows:

**Introduction**

1.    In October of 2006, First Bank made a loan to Flamingo West, LLC ("Borrower") in the original principal amount of $7,791,120 (the "Loan"). To induce First Bank to make the Loan, Richardson and Annecca executed a Guaranty (as defined herein) whereby they guaranteed the payment and performance of all monetary obligations of Borrower to First Bank "of any kind whatsoever, howsoever created … and which arise under the Loan Agreement, the Note (as defined in the Loan Agreement) or any other Loan Document…." The Loan is now in default and by this Complaint, First Bank seeks collection on, and enforcement of, the Guarantors' obligations.

### The Parties

2.        Plaintiff First Bank and Trust Company of Illinois is an Illinois state commercial bank authorized to do business in the State of Illinois.  First Bank maintains its principal corporate office at 300 East Northwest Highway, Palatine, Illinois and is the lender under the Loan.

3.        On information and belief, Defendant Richardson is a resident of Broward County, Florida and is a guarantor under the Guaranty (as defined herein).

4.        On information and belief, Defendant Annecca is a resident of Broward County, Florida and is a guarantor under the Guaranty (as defined herein).

### Venue and Jurisdiction

5.        Jurisdiction in this Court is proper under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states (Florida for the Defendants and Illinois for Plaintiff).

6.        Venue properly lies in the Northern District of Illinois because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. Further, in Section 5.14 of the Guaranty forming the basis of this Complaint, the defendants consented and submitted to the jurisdiction of this Court and to venue in the Northern District of Illinois. *See* 28 U.S.C. § 1391(a)(2) - (3).

### Facts Common to All Counts

7.        On or about October 10, 2006, First Bank made a loan to Borrower in the original principal amount of $7,791,120.00 as evidenced by that certain Note dated October 10, 2006 (the "Note") executed by Borrower and payable to First Bank.  Contemporaneously with execution of

the Note, Borrower and First Bank executed that certain Loan Agreement dated as of October 10, 2006 by and between First Bank and Borrower (the "Loan Agreement"). Copies of the Note and Loan Agreement are attached hereto as Exhibit 1 and Exhibit 2, respectively.

8.    On or about October 10, 2006, to induce First Bank to make the Loan to Borrower, Richardson and Annecca executed a Guaranty of Payment and Performance in favor of First Bank (the "Guaranty," a copy of which is attached hereto as Exhibit 3).

9.    Each of the Guarantors agreed to pay and perform when due the Obligations (as defined in the Guaranty). *See* Guaranty, Exhibit 3, at Section 1.1. Further, the Guaranty is "absolute, independent and continuing under all circumstances, and is a guaranty of payment and performance." *See* Guaranty, Exhibit 3, at Section 1.1.

10.    Under the Guaranty, the term "Obligations" is defined so as to include "all monetary obligations of Borrower to Lender of any kind whatsoever, howsoever created, arising or evidenced, whether pursuant to a covenant, representation, warranty, indemnity or other agreement of any kind, whether direct or indirect, absolute or contingent, recourse or non-recourse, or now or hereafter existing, or due or to become due, and which arise under the Loan Agreement, the Note (as defined in the Loan Agreement) or any other Loan Document...." *See* Guaranty, Exhibit 3, at Section 1.2.

11.    The Guarantors' obligations under the Guaranty are joint and several. *See* Guaranty, Exhibit 3, at Section 5.2.

12.    Under Section 2.11 of the Loan, the Loan matured on April 10, 2008. Under Section 2.6 of the Loan, at the time the Loan matured, the Borrower was obligated to pay all sums due and owing to First Bank. Borrower has not complied with its obligations and is in default of the Loan.

13.     As of July 7, 2008, Borrower owed First Bank $8,202,889.98 in principal, interest, and fees, plus legal fees and expenses.  Interest per diem on the Loan, as well as late fees and attorneys' fees and expenses, continue to accrue after that date under the Loan Agreement, the Note and the Guaranty.

14.     On July 10, 2008, First Bank provided written notice to the Guarantors, copies of which are attached hereto collectively as <u>Exhibit 4</u>, that the Loan had matured and demanded that the Guarantors perform the Obligations under the Guaranty.

15.     Borrower has not paid the amounts owed under the Loan, is in default under the Loan and has failed to cure the default.

16.     Guarantors have not paid the Obligations to First Bank as required by their Guaranty and thus they are in breach of the Guaranty.

## COUNT I

## BREACH OF CONTRACT AGAINST RICHARDSON

17.     First Bank adopts and realleges paragraphs 1 through 16 above as though fully set forth and incorporated herein as this paragraph 17.

18.     Under the terms of the Guaranty, Richardson is obligated to pay First Bank $8,202,889.98.  Richardson is also obligated to pay the interest per diem on the Loan, as well as late fees and attorneys' fees and expenses that continue to accrue under the Loan Agreement, the Note and the Guaranty.

19.     First Bank has fully performed and fulfilled all of the terms and conditions of the Guaranty that it agreed to perform and fulfill.

20.     Richardson has failed to comply with his obligations under the Guaranty.

21.    First Bank has been required to retain legal counsel for the prosecution of this action on the Guaranty and to incur attorneys' fees, court costs and other Expenses, as defined in the Guaranty, as a result of Richardson's failure to comply with the Guaranty.

22.    First Bank has been damaged and continues to be damaged by Richardson's breach of the Guaranty since he has failed to pay and perform the Obligations, as defined in the Guaranty, of the Borrower to First Bank when due and has failed to pay Expenses, as defined in the Guaranty, when First Bank has demanded such payment.

## REQUEST FOR RELIEF

First Bank respectfully requests that this Court enter an order granting to it the following relief:

i.    A judgment in favor of First Bank and against Richardson in an amount not less than $8,202,889.98 plus any additional monetary obligations of Borrower to First Bank including but not limited to per diem interest from July 7, 2008 to date of judgment, late charges, and other amounts due under the Guaranty;

ii.    An additional judgment in favor of First Bank and against Richardson for all attorneys' fees and expenses and all other costs and Expenses (as defined in the Guaranty) of any kind which First Bank has incurred or may incur in attempting to collect, compromise or enforce in any respect the Obligations and Expenses (as defined in the Guaranty); and

iii.    Such other and further relief as this Court deems just and proper.

## COUNT II

## BREACH OF CONTRACT AGAINST ANNECCA

23.    First Bank adopts and realleges paragraphs 1 through 16 above as though fully set forth and incorporated herein as this paragraph 23.

24.    Under the terms of the Guaranty, Annecca is required to pay First Bank $8,202,889.98.  Annecca is also obligated to pay the interest per diem on the Loan, as well as late

fees and attorneys' fees and expenses that continue to accrue under the Loan Agreement, the Note and the Guaranty.

25.     First Bank has fully performed and fulfilled all of the terms and conditions of the Guaranty that it agreed to perform and fulfill.

26.     Annecca has failed to comply with his obligations under the Guaranty.

27.     First Bank has been required to retain legal counsel for the prosecution of this action on the Guaranty and to incur attorneys' fees, court costs and other Expenses, as defined by the Guaranty, as a result of Annecca's failure to comply with the Guaranty.

28.     First Bank has been damaged and continues to be damaged by Annecca's breach of the Guaranty since he has failed to pay and perform the Obligations, as defined in the Guaranty, of the Borrower to First Bank when due and has failed to pay Expenses, as defined in the Guaranty, when First Bank has demanded such payment.

## REQUEST FOR RELIEF

First Bank respectfully requests that this Court enter an order granting to it the following relief:

i.      A judgment in favor of First Bank and against Annecca in an amount not less than $8,202,889.98 plus any additional monetary obligations of Borrower to First Bank including but not limited to per diem interest from July 7, 2008 to date of judgment, late charges, and other amounts due under the Guaranty;

ii.     An additional judgment in favor of First Bank and against Annecca for all attorneys' fees and expenses and all other costs and Expenses (as defined in the Guaranty) of any kind which First Bank has incurred or may incur in attempting to collect, compromise or enforce in any respect the Obligations and Expenses (as defined in the Guaranty); and

iii.    Such other and further relief as this Court deems just and proper.

Dated: September 2, 2008

Respectfully submitted,

FIRST BANK AND TRUST COMPANY OF ILLINOIS

By:    s/ Roger H. Stetson _____
       One of its Attorneys

John W. Roberts (06183468)
Roger H. Stetson (06279862)
BARACK FERRAZZANO KIRSCHBAUM &
  NAGELBERG LLP
200 W. Madison Street, Suite 3900
Chicago, Illinois 60606
Telephone: (312) 984-3100
Facsimile: (312) 984-3150
Email: john.roberts@bfkn.com
Email: roger.stetson@bfkn.com

08CV4987
JUDGE NORDBERG
MAGISTRATE JUDGE ASHMAN
EDA

# EXHIBIT 1

 

Loan Number _____

2.2

## PROMISSORY NOTE

$7,791,120.00                                                    October *10*, 2006
                                                                Palatine, Illinois

**FOR VALUE RECEIVED**, the undersigned, FLAMINGO WEST, LLC, a Florida limited liability company ("**Borrower**"), promises to pay to the order of FIRST BANK AND TRUST COMPANY OF ILLINOIS, an Illinois State commercial bank, or the holder hereof from time to time ("**Lender**"), at such place as may be designated in writing by Lender, the principal sum of SEVEN MILLION, SEVEN HUNDRED NINETY-ONE THOUSAND, ONE HUNDRED TWENTY AND NO/100 DOLLARS ($7,791,120.00), with interest thereon as hereinafter provided. This note (this "**Note**") is issued pursuant to the terms of a Loan Agreement of even date herewith by and between Borrower and Lender (said Loan Agreement, as same may be amended and modified from time to time, is referred to hereinafter as the "**Loan Agreement**"). All capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the Loan Agreement.

Interest shall accrue on all sums as advanced and outstanding from time to time under this Note and Loan Agreement as set forth in the Loan Agreement, and such interest shall be due and payable as set forth in the Loan Agreement. All sums owing hereunder are payable in lawful money of the United States of America, in immediately available funds.

The outstanding principal balance of this Note, together with all accrued and unpaid interest, shall be due and payable on the Maturity Date. Additional principal payments shall be made in accordance with the provisions of the Loan Agreement.

This Note is issued pursuant to the terms of a Loan Agreement and is secured by and entitled to the benefits of, among other things, the Collateral Documents. In case an Event of Default (as defined under any of the Loan Agreement, the Collateral Documents, or other Loan Document) shall occur and be continuing (any of the foregoing being a "**Event of Default**" hereunder), the principal of this Note together with all accrued interest thereon may, at the option of the holder hereof, immediately become due and payable on demand; provided, however, that if any document related to this Note provides for automatic acceleration of payment of sums owing hereunder, all sums owing hereunder shall be automatically due and payable in accordance with the terms of that document.

Unless otherwise provided in the Loan Agreement, all payments on account of the indebtedness evidenced by this Note shall be first applied to the payment of costs and expenses of Lender which are due and payable, then to past-due interest on the unpaid principal balance and the remainder to principal.

Provided that no Event of Default then exists, this Note may be prepaid only upon those terms and conditions set forth in the Loan Agreement.

If any payment of interest or principal required hereunder or under any other Loan Documents is not received by Lender on or before the 1st day of the month in which it becomes

Loan Number _____

due, Borrower shall pay, at Lender's option, a late or collection charge equal to 5% of the amount of such unpaid payment to defray part of the increased cost of collecting late payments and the opportunity costs incurred by Lender because of the unavailability of the funds.

From and after the Maturity Date, or such earlier date as all sums owing on this Note become due and payable by acceleration or otherwise, or after the occurrence of an Event of Default, interest shall be computed on all amounts then due and payable under this Note at a **"Default Rate"** equal to 21% per annum (based on a 360-day year and charged on the basis of actual days elapsed).

If any attorney is engaged by Lender to enforce or defend any provision of this Note or any of the other Loan Documents, or as a consequence of any Event of Default, with or without the filing of any legal action or proceeding, then Borrower shall pay to Lender immediately upon demand all attorneys' fees and expenses, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance owing hereunder as if such unpaid attorneys' fees and expenses had been added to the principal.

No previous waiver and no failure or delay by Lender in acting with respect to the terms of this Note or any of the other Loan Documents shall constitute a waiver of any breach, default or failure of condition under this Note, the Loan Agreement or any of the other Loan Documents or the obligations secured thereby. A waiver of any term of this Note or any of the other Loan Documents or of any of the obligations secured thereby must be made in writing and shall be limited to the express written terms of such waiver. In the event of any inconsistencies between the terms of this Note and the terms of any other document related to the loan evidenced by this Note, the terms of this Note shall prevail.

Except as otherwise provided in the Loan Agreement, Borrower expressly waives presentment, demand, notice of dishonor, notice of default or delinquency, notice of acceleration, notice of protest and nonpayment, notice of costs, expenses or losses and interest thereon, notice of late charges, and diligence in taking any action to collect any sums owing under this Note or in proceeding against any of the rights or interests in or to properties securing payment of this Note. In addition, Borrower expressly agrees that this Note and any payment coming due hereunder may be extended from time to time without in any way affecting the liability of any such party hereunder.

Time is of the essence with respect to every provision hereof. This Note shall be construed and enforced in accordance with the laws of the State of Illinois, except to the extent that federal laws preempt the laws of the State of Illinois, and all persons and entities in any manner obligated under this Note consent to the jurisdiction of any federal or State court within the State of Illinois having proper venue and also consent to service of process by any means authorized by Illinois or federal law. Any reference contained herein to attorneys' fees and expenses shall be deemed to be to reasonable fees and expenses and to include all reasonable fees and expenses of in-house or staff attorneys and the reasonable fees and expenses of any other experts or consultants.

All agreements between Borrower and Lender (including, without limitation, this Note and the Loan Agreement, and any other documents securing all or any part of the indebtedness

Loan Number _____

evidenced hereby) are expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid to Lender exceed the highest lawful rate of interest permissible under applicable law. If, from any circumstances whatsoever, fulfillment of any provision hereof, the Loan Agreement or any other documents securing all or any part of the indebtedness evidenced hereby at the time performance of such provisions shall be due, shall involve exceeding the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the highest lawful rate of interest permissible under such applicable laws, and if, for any reason whatsoever, Lender shall ever receive as interest an amount which would be deemed unlawful under such applicable law, such interest shall be automatically applied to the payment of the principal of this Note (whether or not then due and payable) and not to the payment of interest or refunded to Borrower if such principal has been paid in full.

Any notice which either party hereto may be required or may desire to give hereunder shall be governed by the notice provisions of the Loan Agreement.

BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN ANY WAY IN CONNECTION WITH THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY OTHER STATEMENTS OR ACTIONS OF BORROWER OR LENDER. BORROWER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS NOTE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS DISCUSSED THIS WAIVER WITH SUCH LEGAL COUNSEL. BORROWER FURTHER ACKNOWLEDGES THAT (i) IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER, (ii) THIS WAIVER HAS BEEN REVIEWED BY BORROWER AND BORROWER'S COUNSEL AND IS A MATERIAL INDUCMENT FOR LENDER TO ENTER INTO THE LOAN DOCUMENTS, AND (iii) THIS WAIVER SHALL BE EFFECTIVE AS TO EACH OF THE LOAN DOCUMENTS AS IF FULLY INCORPORATED THEREIN.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Loan Number _____

**IN WITNESS WHEREOF**, the undersigned has executed this Note or caused this Note to be executed by its duly authorized representative as of the date first above written.

BORROWER:

FLAMINGO WEST, LLC, a Florida limited liability company

By: _____
Kenneth E. Richardson
Managing Member

By: _____
Michael Anrecca
Managing Member

08CV4987
JUDGE NORDBERG
MAGISTRATE JUDGE ASHMAN
EDA

# EXHIBIT 2

LOAN AGREEMENT

between


FLAMINGO WEST, LLC


and


FIRST BANK AND TRUST COMPANY OF ILLINOIS


Executed as of October 10, 2006

Loan No. _____

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**") is dated as of October 10, 2006 and is made by and between FLAMINGO WEST, LLC, a Florida limited liability company ("**Borrower**"), and FIRST BANK AND TRUST COMPANY OF ILLINOIS, an Illinois state commercial bank ("**Lender**").

## RECITALS

A.     Borrower holds fee simple title to the parcel of real property located at 4241 N. Ocean Blvd., Ft. Lauderdale, FL, legally described in the Mortgage, along with all improvements thereon and easements and appurtenances thereto (the "**Property**").

B.     Borrower has requested a loan from Lender for the purpose of refinancing a portion of the cost of the acquiring the Property and to finance construction of the Project (defined below) on the Property, all in the manner and as further described herein and subject to the terms and conditions hereof.

C.     As a condition of making said loan, Lender requires that Borrower and its affiliates execute and deliver this Agreement and the other Loan Documents (as hereinafter defined).

THEREFORE, in consideration of the mutual covenants, conditions and agreements herein contained, the parties hereto hereby agree as follows:

## AGREEMENT

1.     **DEFINITIONS.**

   **1.1.   Defined Terms**.   The following capitalized terms generally used in this Agreement shall have the meanings defined or referenced below.  Certain other capitalized terms used only in specific sections of this Agreement are defined in such sections.

   "**Acquisition Cost**" shall mean the aggregate costs and expenses relating to the acquisition of the Property as evidenced to Lender's reasonable satisfaction by a copy of any and all documentation reasonably requested by Lender.

   "**ADA**" shall mean the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et. seq., as hereinafter amended or modified.

   "**Additional Loan Amount**" shall be an amount equal to (i) the Loan Amount, minus (ii) the amount of the Opening Disbursement.

   "**Affiliate**" or "**Affiliates**" as to a person or entity shall mean that person or entity's partners, members or parent and subsidiary corporations, and any other entity or person directly or indirectly, controlling, controlled by or under common control with said person or entity, and their respective affiliates, shareholders, directors, officers, employees and agents.

I:\TCC\FirstBank&TrustCo\FlamingoWest\LoanAgreement-004.doc

Loan No. _____

"**Application for Payment**" shall mean an application for payment in a form acceptable to Lender in its sole discretion.

"**Appraisal**" shall mean a written appraisal prepared in compliance with all applicable laws and regulatory requirements, including, without limitation, the Financial Institutions Recovery, Reform and Enforcement Act of 1989 as amended from time to time, by an independent appraiser acceptable to Lender and subject to both Lender's customary independent appraisal requirements and Lender's internal review to determine whether it contains errors, which review shall be conducted within 30 days after receipt by Lender of same and prior to Lender's approval (or deemed approval) of same.

"**Appraised Value**" shall mean the fair market value of the Property as determined by an Appraisal.

"**Architect**" shall mean the licensed Florida architect who is acting as Borrower's architect for the entire Project.

"**Assignee Lender**" shall have the meaning ascribed to such term in **Section 12.2**.

"**Assignment of Contracts and Permits**" shall mean a collateral assignment duly executed by Borrower and consented to by such parties as Lender may request pursuant to which Borrower assigns to Lender: (A) all right, title and interest in and to all contracts relating to or entered into in connection with the Property, including, without limitation, general contracts, subcontracts, sub-subcontracts and material purchase orders, or property management agreements, now or hereafter entered into in connection with the management of the Project, or any portion thereof, relating to the Property; and (B) to Lender all right, title and interest in and to all permits, authorizations, approvals and licenses issued from time to time with respect to the Property.

"**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978 (11 USC § 101-1330), as hereinafter amended or recodified.

"**Borrower**" shall have that meaning ascribed to it above.

"**Borrower Annual Report**" shall have the meaning ascribed to such term in **Section 10.1**.

"**Borrower's Funds**" shall mean funds contributed to the Property pursuant to the terms of this Agreement either in connection with Acquisition Costs or otherwise.

"**Borrower Parties**" shall mean the Borrower and the Guarantors.

"**Business Day**" shall mean a day of the week (but not a Saturday, Sunday or holiday) on which the Palatine, Illinois offices of Lender are open to the public for carrying on substantially all of Lender's business functions. Unless specifically referenced in this Agreement as a Business Day, all references to "days" shall be to calendar days.

Loan No. _____

"**Change Orders**" mean any changes in the Plans and Specifications and any "Change Orders" as defined in any construction contract relating to the Improvements.

"**Collateral**" shall mean all the property (including all personal, real, tangible and intangible property) in which the Collateral Documents grant (or purport to grant) Lender a security interest.

"**Collateral Documents**" shall mean the Mortgage, and the Assignment of Contracts and Permits.

The "**Completion Date**" shall be the date that is 12 months after the date of this Agreement set forth above.

"**Default Rate**" shall have the meaning given in **Section 2.11**.

"**Engineer**" shall mean the licensed Florida engineer engaged by Borrower to perform engineering services for the Project.

"**Event of Default**" shall have the meaning ascribed to such term in **Section 11.1.1**.

"**FEMA**" shall mean the Federal Emergency Management Agency.

"**Guarantors**" shall mean Kenneth E. Richardson and Michael Annecca.

"**Guaranties**" shall mean the Guaranty of Payment and Performance and the Guaranty of Completion executed by each of the Guarantors.

"**Hazardous Materials**" shall have the meaning ascribed to such term in **Section 7.1.1**.

"**Hazardous Materials Claims**" shall have the meaning ascribed to such term in **Section 7.1.3**.

"**Hazardous Materials Indemnity Agreement**" shall mean that certain Hazardous Materials Indemnity Agreement executed by Borrower and Guarantor.

"**Hazardous Materials Laws**" shall have the meaning ascribed to such term in **Section 7.1.2**.

"**Improvements**" shall mean the buildings and other structures to be constructed on the Property, together with all necessary or required site improvements and all appurtenances and fixtures, including without limitation a four-story, 11-unit residential condominium building having 25,360 square feet of gross building area including 24,760 square feet of gross living area, a ground level parking garage with 24 interior parking spaces, 11 small storage rooms, and a balcony on each Unit. The Units shall be constructed as follows:

Total # of

Loan No. _____

| Unit Type | Units | Bed/Bath | GLA/Unit | Total GLA |
|-----------|-------|----------|----------|-----------|
| A | 2 | 2 BR/2.5BA/DEN | 1,995 | 3,990 |
| B | 3 | 2 BR/2.5BA/DEN | 2,053 | 6,159 |
| C | 2 | 2 BR/2.5BA/DEN | 2,108 | 4,216 |
| D | 3 | 2 BR/2.5BA/DEN | 2,190 | 6,570 |
| E | 1 | 3 BR/4.5 BA/DEN | 3,825 | 3,825 |
| Totals: | 11 | | 2,251 avg. | 24,760 |

Each unit will feature high end finishes including designer fixtures in the bathrooms and kitchen, stainless steel appliances, state of the art fire protection and sprinkler systems.

"**Interest Rate Cap**" shall have the meaning given in Section 12.7 herein below.

"**Interest Rate Protection Agreement**" shall mean an interest rate swap, cap, collar or other hedging or derivative agreement, to which Lender is the counterparty, intended to mitigate Borrower's interest rate risk pertaining to the Loan, along with any other related agreement or instrument executed by Borrower in connection therewith.

"**Leases**" shall mean all leases, licenses or other agreements providing for the use or occupancy of any portion of the Property, including all amendments, extensions, renewals, supplements, modifications, sublets and assignments thereof and all separate letters or separate agreements relating thereto.

"**Lender**" shall have that meaning ascribed to it above.

"**Lender's Inspector**" shall mean an architect or other consultant engaged by Lender at Borrower's sole cost to advise Lender as to construction matters under this Agreement.

"**Loan**" shall mean the loan described in **Section 2.1**.

"**Loan Amount**" shall have the meaning ascribed to such term in **Section 2.11**.

"**Loan Documents**" shall mean those documents, as hereafter amended, supplemented, replaced or modified from time to time, properly executed and in recordable form, if necessary, listed as Loan Documents in **Exhibit A**, and shall also include (x) any Interest Rate Protection Agreement between Borrower and Lender, and (y) any other agreement executed by Borrower in favor of or with Lender in connection with the transactions contemplated by this Agreement.

"**Loan Fee**" shall have the meaning ascribed to such term in **Section 2.3**.

Loan No. _____

"**Loan to Value Percentage**" at any time shall mean the then total outstanding principal balance of the Loan (plus the then total of any undisbursed principal balance of the Loan) as a percentage of the then fair market value of the Property and Improvements, after adjustment for senior liens and regular and special tax assessments.

"**Maturity Date**" shall have the meaning given in **Section 2.11**.

"**Mortgage**" shall mean, with respect to the Property, the Mortgage, Assignment of Lease and Rents, Security Agreement and Fixture Filing executed by Borrower. The Mortgage and each of the other Loan Documents securing the Loan shall secure, among other things, the indebtedness evidenced by the Note, all other advances and payments by Lender, all expenses described herein, the Loan Fee, and all other amounts payable by Borrower under this Agreement or any of the other Loan Documents as and when advanced or incurred, to the same extent as if all such obligations were set forth in the Mortgage or such other Loan Document, as the case may be, whether or not the aggregate amount of all such obligations exceeds the face amount of the Note.

"**Municipality**" shall mean, the county, city or other local governmental unit in which the Property is located.

"**Note**" shall mean the Promissory Note of even date herewith duly executed by Borrower in the stated principal amount of the Loan Amount bearing interest at the Note Rate.

"**Note Rate**" shall have the meaning given in **Section 2.11**.

"**Opening Disbursement**" shall have the meaning ascribed to such term in **Section 3.1**.

"**Organizational Documents**" shall mean, with respect to a (i) corporation, the articles or charter and bylaws; (ii) with respect to a partnership, the partnership agreement and certificate of limited partnership; (iii) with respect to a limited liability company, the operating agreement and certification of formation; (iv) with respect to a trust, the trust agreement; and (v) with respect to an individual, none.

"**Permits**" shall mean all permits and approvals relating to zoning (including, without limitation, any planned unit development ordinance), building or construction, or issued by the local sanitary district, state department of transportation, FEMA, the state and federal Environmental Protection Agency, the state and/or local historical preservation agency or any other governmental authority (including, without limitation, the Municipality), necessary for commencement and completion of the construction and installation of all of the Improvements.

"**Permitted Exceptions**" shall mean those title exceptions approved in writing by Lender in its sole discretion.

"**Plans and Specifications**" shall mean all of the final, detailed plans and specifications for the Improvements prepared in part by the Architect and in part by the Engineer.

"**Potential Event of Default**" shall mean an event or circumstance that with the passage of time, the giving of notice or both, could become an Event of Default.

Loan No. _____

"**Prime Rate**" shall mean the prime rate of interest charged from time to time by Bank of America and identified as Bank of America's prime or equivalent rate, which may not necessarily be the best rate or lowest rate of interest charged or offered by the Bank of America.

"**Project**" shall mean all of the Improvements located on the Property, together with any fixtures, fittings, apparatus, machinery, equipment and other personal property, and any replacements thereof or substitutes therefor, now or at any time hereafter owned by Borrower and located on the Property or not located on the Property but used in any way in connection with the Property or the Improvements located thereon (other than tangible personal property located at Borrower's main office).

"**Project Cost Analysis**" shall mean the budget attached hereto as **Exhibit B** setting forth all expenses and costs which either have been incurred or Borrower reasonably estimates will be incurred, and all reserves to be established and maintained, in connection with the renovation, construction and installation of the Improvements, as well as required Borrower's Funds, including, without limitation, with respect to the cost of installation of upgrades.

"**Property**" shall have the meaning ascribed to such term in **Recital A**. If there is only one Property, any references herein to multiple Properties shall be deemed to refer to the Property.

"**Qualified Contract**" at any time shall mean a fully executed, binding and enforceable contract for the sale of a Unit which is approved in writing by Lender prior to closing of the Loan, or which is executed after closing of the Loan and: (i) which is made at arm's length to a third party purchaser who (A) is unrelated to the Borrower, the Guarantors, or any person or entity affiliated with or having any ownership interest in any of such entities, and (B) has not contracted (directly or through affiliates) to purchase more than two Units; (ii) which is made on the Form Contract which has been approved in writing by the Lender, with no material modifications to the form contract, other than those approved by the Lender in writing; (iii) as to which the purchaser has deposited in escrow as required by law a nonrefundable Unit Deposit of not less than 10% of the sales price (with the purchaser obligated to make an additional escrow Unit Deposit of not less than 10% of the sales price not later than the date of pouring the concrete slab for the foundation of the Project); (iv) which prohibits assignment of the purchaser's rights under the contract (other than to affiliates, family members, or to entities owned, controlled by, or under common control with affiliates or family members); (v) which provides for a sales price which will yield net cash closing proceeds, after payment of all closing costs of not less than the Release Payment for that Unit; (vi) which has been assigned to Lender as collateral security for the Loan, and as to which there is no default by either the Borrower or the purchaser; (vii) which (except for contracts executed prior to closing of the Loan) is executed by the purchaser no more than thirty days prior to delivery of the contract to the Lender; (viii) as to which (A) the Borrower has made any and all required registrations under applicable Securities Laws, as well as all other required statutory disclosures, and (B) no right of rescission exists under the contract or any applicable laws; (ix) which requires that a purchaser close on the purchase of the Unit promptly after a certificate of occupancy is issued for the Unit, even if all amenities have not been completed; (x) which does not contain any financing or similar contingency; and (xi) without limitation of the foregoing, which is not subject to any right of

Loan No. _____

rescission under the Florida Condominium Act or under the Interstate Land Sales Full Disclosure Act ("ILSA"), and which is not likely to be subject to rescission under ILSA, taking into consideration the date such purchase and sale agreement was executed, and the date of anticipated completion of construction of the applicable unit, as determined by the Lender at the applicable time.

"**REA**" shall mean a reciprocal easement agreement or the like (together with any amendments or modifications thereto) concerning the Property executed by and between the Borrower and owners of adjacent property and/or lessees under Leases.

"**Release Payment**" shall mean, with respect to a particular Unit, the Release Payment for such Unit on **Exhibit C** attached hereto, which amount is required to be paid by Borrower to Lender with respect to that Unit in order to obtain the release of the lien of the Mortgage on such Unit in accordance with the terms and conditions of Section 2.9.

"**RICO Related Law**" shall mean the Racketeer Influenced and Corrupt Organizations Act of 1970 or any other federal, state or local law for which forfeiture of assets is a potential penalty.

"**Securities Laws**" shall mean the Securities Act of 1933, as amended, and applicable federal regulations under that Act, and the "blue sky laws" or comparable laws and regulations of each state or other jurisdiction in which the Units have been offered or are deemed to have been offered.

"**Site Plan**" shall mean a site plan of the Property showing the Improvements upon completion of the construction contemplated pursuant to the Plans and Specifications.

"**Survey**" shall mean a current plat of survey of the Property certified to Lender by a surveyor registered in the state in which the Property is located and prepared in accordance with the "Minimum Standard Detail Requirements for Land Title Surveys" most recently established by ALTA and ACSM, including Table A items 1-4, 6-11 and 13-16.

"**Title Company**" shall mean First American Title Insurance Company.

"**Title Insurance Policy**" shall mean an ALTA Lender's Policy of Title Insurance as issued by the Title Company containing such permitted endorsements as Lender may require including, without limitation, a pending disbursement endorsement, a Florida Form 9 endorsement, and a variable rate endorsement.

"**Transfer**" shall mean any conveyance, transfer, sale, assignment, pledge, hypothecation, mortgage, encumbrance or other disposition of all or any portion of the Property or of any interest in Borrower, as applicable, or the entering into of any agreement to do any of the foregoing, whether the same occurs directly, indirectly, by operation of law or otherwise.

"**UCC**" shall mean the Uniform Commercial Code as enacted in the State of Florida.

Loan No. _____

"**Units**" shall mean the 11 residential condominium units which are part of the Improvements.

"**Unit Deposit**" shall mean any deposit of earnest money made by a purchaser under any contract executed by Borrower for sale and purchase of a Unit.

**1.2.    Exhibits and Schedules Incorporated**.    All exhibits and schedules attached hereto or referenced herein, are hereby incorporated into this Agreement.

## 2.    LOAN.

**2.1.    The Loan**.    Borrower desires to borrow from Lender a loan (the "**Loan**") in an amount equal to the Loan Amount, the proceeds of which shall be used for refinancing of the existing loan on the Property, construction of the Improvements, and marketing and sale of the Units.    Any amounts of the Loan disbursed by Lender shall not, in total, exceed the Loan Amount.    In the event either the Loan Amount or a Loan-to-Value Percentage of 69.56% (using discounted sell-out value) is ever exceeded, Borrower shall promptly, upon demand from Lender, pay to Lender any such excess.' Borrower acknowledges and agrees that Lender has not made any commitments, either express or implied, to extend the term of the Loan past the Maturity Date or to provide Borrower with financing for the construction of any improvements other than as expressly provided herein.

**2.2.    Use of Proceeds**.    Borrower agrees to borrow the Loan from Lender to the extent amounts are required by Borrower for the purposes set forth herein (and for no other use or purpose) and to apply all proceeds of the Loan for such purposes, and for no other purpose.    Upon satisfaction of all terms and conditions to Lender's disbursement obligations set forth herein, Lender will disburse the proceeds of the Loan as herein provided for the payment of a portion of the costs and expenses of the renovation, construction and installation of the Improvements, all as shown on the Project Cost Analysis. Furthermore, subject to the foregoing, Borrower agrees to borrow and expend such proceeds of the Loan and such Borrower's Funds as it is reasonably necessary to expend in order to ensure the on-going operation of the Property.

**2.3.    Loan Fee**.    Borrower shall pay Lender a loan fee (the "**Loan Fee**") for the Loan in an amount equal to one-half of one percent (0.5%) of the Loan Amount.    The entire Loan Fee shall be deemed fully earned, payable and non-refundable upon the execution of this Agreement.

**2.4.    Loan Documents**.    Borrower shall deliver to Lender concurrently with this Agreement each of the Loan Documents, properly executed and in recordable form, as applicable.

**2.5.    Agreement Date**.    The Loan Documents shall become effective on the date of this Agreement.

**2.6.    Maturity Date**.    On the Maturity Date or any earlier acceleration of it, all sums due and owing under this Agreement and the other Loan Documents shall be repaid in full.    All payments due under this Agreement shall be paid in immediately available funds.

Loan No. _____

**2.7.   Omitted.**

**2.8.   Note Rate.**

**2.8.1.   Interest Rate.**  All disbursements of Loan proceeds shall bear interest at the Note Rate, subject to the default interest provisions contained herein, and subject to the Interest Rate Cap.

**2.8.2.   Interest Payments.**  Subject to **Section 2.8.3.2**, interest accrued on the outstanding amount of the Loan shall be payable by Borrower in arrears on the first Business Day of the first calendar month following the date of this Agreement, and the first Business Day of each succeeding calendar month thereafter, and on the Maturity Date.

**2.8.3.   Default Interest; Late Charge.**

**2.8.3.1.**   If any payment of principal due hereunder or under any other of the Loan Documents or any Other Related Document is not received by Lender on or before the date such payment becomes due, Borrower shall pay to Lender a late charge equal to 5% of the amount of such unpaid payment to defray part of the increased cost of collecting late payments and the opportunity costs incurred by Lender because of the unavailability of the funds.  In addition to the late charge, Borrower shall pay interest on the entire outstanding principal balance of this Note at the Default Rate from and after the date when the payment was due.

**2.8.3.2.**   Notwithstanding the rates of interest and the payment dates specified in this Section 2.8, effective immediately upon the occurrence and during the continuance of any Event of Default, the principal balance of the Loan then outstanding and, to the extent permitted by applicable law, any interest payment not paid within five days after the same becomes due shall bear thereafter interest payable upon demand at the Default Rate.  In addition, all other amounts due Lender (whether directly or for reimbursement) under this Agreement or any of the other Loan Documents, if not paid when due or, in the event no time period is expressed, if not paid within five days after written notice from Lender that the same has become due, shall thereafter bear interest at the foregoing default rate.  Finally, any amount due on the Maturity Date which is not then paid shall also bear interest thereafter at the Default Rate

**2.8.4.   Computation of Interest.**  Interest shall be computed on the basis of the actual number of days elapsed in the period during which interest accrue and a year of 360 days.  In computing interest, the date of funding and the date of payment shall be included.

**2.9.   Releases.**  Subject to the terms and conditions of **Section 2.10** below, in connection with the arms-length sale of a Unit, Lender shall release the lien of its Mortgage from that Unit using Lender's form of release of lien current as of the date of such release, provided that (i) Lender has received the required Release Payment with respect to such Unit, (ii) no Potential Event of Default, nor any Event of Default, is then continuing hereunder, and (iii) Borrower promptly pays all of Lender's costs and expenses (including, without limitation, attorneys' fees and expenses) incurred in considering and implementing such release.

Loan No. _____

Immediately and automatically (without the need for further action by either Lender or Borrower) following any release occurring in accordance with this **Section 2.9**, **Exhibit C** shall be deemed revised to eliminate reference to the released Property and Loan Amount shall be reduced by the amount of the Release Payment.

### 2.10. Payments.

**2.10.1.** **Prepayments.** Borrower shall make partial prepayments of the Loan in compliance with **Section 2.9.**

**2.10.2.** **Omitted.**

**2.10.3.** **Manner and Time of Payment.** All payments of principal, interest, fees and other sums hereunder payable to Lender shall be made, without condition or reservation of right and free of set-off or counterclaim, in U.S. dollars and by wire transfer (pursuant to Lender's written wire transfer instructions) of immediately available funds delivered to Lender not later than 2:00 P.M. (Central Standard Time) on the date due. Funds received by Lender after that time and date shall be deemed to have been paid on the next succeeding Business Day.

**2.10.4.** **Payments on Non-Business Days.** Whenever any payment to be made by Borrower hereunder shall be stated to be due on a day which is not a Business Day, payments shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

**2.11.** **Summary of Certain Terms of the Note.** As provided elsewhere in this Agreement, the Note: (i) shall be in the stated principal amount of the Loan Amount; (ii) shall bear interest prior to default at the Note Rate, and from and after default at the Default Rate, in each case calculated and accruing as provided in this Section 2; (iii) shall require monthly payments of interest only, and mandatory prepayments of principal and Exit Fee partial payments in the amount of the applicable Release Payment due to Lender upon closing of the sale of any Condominium Unit; and (iv) shall mature at the Maturity Date. The "**Loan Amount**" shall mean $7,791,120.00. The "**Maturity Date**" shall mean the date that is 18 months after the date of this Agreement. The "**Note Rate**" shall mean that rate per annum of interest equal to (a) the Prime Rate, plus (b) five tenths of one percent (0.5%). Subject to the limitation of the Note Rate Cap, the Note Rate shall never be less than the greater of: (i) 8.75% per annum; or (ii) calculated Note Rate that is in effect at closing of the Loan. The Prime Rate is a reference rate only, and is not necessarily the lowest or best rate offered by the Lender for loans to its borrowers. "**Interest Rate Cap**" shall mean the rate of 21% per annum. The "**Default Rate**" shall mean seven hundred (700) basis points above the Note Rate (as defined below), computed based on a 360-day year and charged on the basis of actual days elapsed; but in no event shall the Default Rate exceed the Interest Rate Cap.

## 3. DISBURSEMENT.

**3.1.** **Loan Opening and Disbursements of Loan Proceeds.** At such time as all of the terms and conditions set forth in **Section 3.2** have been satisfied by Borrower and Borrower has

executed and delivered or caused to be executed and delivered to Lender each of the Loan Documents in form and substance satisfactory to Lender, in its sole and absolute discretion, Lender shall disburse to Borrower an amount approved by Lender pursuant to a separate loan closing statement (the "**Opening Disbursement**"). In the event Borrower fails to satisfy such disbursement conditions, Borrower nevertheless shall pay all costs and expenses incurred by Lender in connection with the transactions contemplated herein promptly upon receipt of an invoice therefor from Lender (and, if appropriate, any Affiliate of Lender).

The Opening Disbursement shall include the following:

**3.1.1. Tax and Insurance Reserve.** Lender has allocated and reserved from the proceeds of the Loan the sum of $67,000.00 (the "**Tax and Insurance Reserve**") to payment of property taxes and insurance provisions on the Property. Borrower acknowledges and assumes all risk that such allocation may be insufficient. If the amounts in the Tax and Insurance Reserve are sufficient, Lender may (and shall after Borrower's written request) pay the insurance premium, and pay the tax amount to the taxing authorities, at any time when due. Notwithstanding the foregoing, the Lender shall at all times have the right, after a default by Borrower, to apply such funds to the obligations of the Loan as the Lender deems appropriate.

**3.1.2. Interest Reserve.** Lender has allocated and reserved the sum of $828,729.00 from the proceeds of the Loan to the payment of interest hereunder (the "**Interest Reserve**"). Borrower acknowledges and assumes all risk that such allocation may be insufficient. Borrower authorizes Lender to disburse and charge the Interest Reserve for interest due under this note on each date that interest payments become due. Interest shall accrue on Loan proceeds allocated to the Interest Reserve from and after the same are disbursed hereunder. Such disbursement may be made by a bookkeeping entry Lender's records reflecting, as an additional disbursement under the Loan, an amount equal to the accrued interest due and payable on the relevant payment date. The Interest Reserve shall be available only for disbursement of the payment of accrued interest due to Lender under the Loan, and subject to all terms and conditions of this Agreement and the Note. Any such funds disbursed from the Interest Reserve shall be deemed to have been paid to and received by Borrower. Borrower recognizes that the payment of interest by the method provided herein is for Borrower's convenience and benefit. If at any time Lender determines that there is any deficiency in the Interest Reserve, the Borrower shall deposit with the Lender the amount of such deficiency within 10 days after demand. Upon the happening of any default under the Loan, or any event or circumstance which with the giving of notice, passage of time or both would constitute a default under the Loan, the Borrower shall not be permitted to receive disbursements from the Interest Reserve, and all remaining interest charges under the Loan shall be paid directly from sources other than the proceeds of the Loan. The depletion in whole of the Interest Reserve shall in no manner relieve Borrower of the obligation to pay interest on the dates specified in the Note.

**3.2.    Conditions Precedent to Opening Disbursement.** In addition to the Loan Documents, and in conjunction with and as additional (but independent) supporting evidence for certain of the covenants, representations and warranties made by Borrower herein, prior to and as a condition of the Opening Disbursement, Borrower shall deliver or cause to be delivered to

Loan No. _____

Lender each of the following, each of which shall be in form and substance satisfactory to Lender, in its sole and absolute discretion:

      **3.2.1.　Title Insurance Policy.**　Concurrently with the recording of the Mortgage, a Title Insurance Policy issued by the Title Company with respect to the Property, insuring, in an amount equal to the Loan Amount, as of the date of the Opening Disbursement, the Mortgage to be a valid first and prior lien on the Property, subject only to the Permitted Exceptions.

      **3.2.2.　Borrower's Funds.**　Not less than one Business Day prior to the Opening Disbursement, evidence satisfactory to Lender (in Lender's sole and absolute discretion) that Borrower has contributed Borrower's Funds to the Property in an amount not less than the difference between: (i) the total Project cost as shown on the Project Cost Analysis; and (ii) the Loan Amount.

      **3.2.3.　Insurance.**　Evidence of the insurance described in **Section 5.**

      **3.2.4.　Property Specific.**　With respect to the Property:

          **3.2.4.1.　Plat of Subdivision and Annexation Agreement.**　To the extent available, a true and complete copy of any recorded plat of subdivision for the Property, any annexation agreement affecting the Property, and any resolutions and ordinances of the relevant Municipality approving same.

          **3.2.4.2.　Survey.**　A Survey for the Property indicating no condition which Lender determines could interfere with or impair the operation of any Property.

          **3.2.4.3.　Environmental Assessment.**　All existing environmental studies and reports relating to the Property and a current environmental assessment of the Property performed by a licensed environmental consultant satisfactory to Lender indicating no violations of any Hazardous Materials Laws and otherwise acceptable to Lender, including, without limitation, copies of all agreements relating to environmental matters which are material to the Property, copies of all of the licenses and permits, and copies of any initial study, negative declaration, mitigated negative declaration, environmental impact report, notice of determination or notice of exemption prepared, adopted, certified or filed by or with the applicable Municipality and any other appropriate governmental agency in connection with the Property or the operation thereof.

          **3.2.4.4.　Permits and Licenses.**　True and complete copies of all material Permits, authorizations, approvals and licenses issued with respect to the Property.

          **3.2.4.5.　Omitted.**

          **3.2.4.6.　Agreements.**　Certified copies of each material agreement affecting the Property, including, without limitation, Borrower's agreements with any general contractor or other contractors or subcontractors as requested by Lender, and any development

Loan No. _____

agreement entered into with any Municipality or another party concerning any material aspect of the construction of all or any portion of the Project.

**3.2.4.7.    Omitted.**

**3.2.4.8.    Flood Plain and Wetlands.** Evidence satisfactory to Lender either (i) that no portion of the Property is located (x) in an area designated by FEMA as a Special Flood Hazard Area, (y) in an area classified as "wetlands," or (z) in an area designated by any federal, state or local governmental or quasi-governmental agency as a "floodway," special flood hazard area or flood plain, or (ii) if a portion of the Property is in any such area, that such portion will be modified so that no Improvements will be constructed in such area as long as it is so designated.

**3.2.4.9.    Utility Availability.** Evidence satisfactory to Lender that sufficient water and sanitary sewer treatment capacity, electric service, telephone service and gas are available for the Project in sufficient capacity and on customary and reasonable terms.

**3.2.4.10.    Soil Report.** To the extent in Borrower's possession or control, any assessment of the soil of the Property.

**3.2.5.    Qualified Contracts.**

**3.2.5.1.    Form Contract.** A certified copy of the form of the purchase and sale contract for the Units, which shall be consistent with the determinants comprising the definition of a Qualified Contract set forth herein and shall be otherwise satisfactory to Lender (the "**Form Contract**").

**3.2.5.2.    Existing Qualified Contracts.** Copies of all executed contracts for purchase and sale of Units that exist as of the date of the Opening Disbursement, each of which shall satisfy all requirements of a Qualified Contract, and all of which shall together constitute not less than 7 Qualified Contracts, having an aggregate purchase price of not less than $7,028,050.00.

**3.2.5.3.    Unit Deposits.** All Unit Deposits under all contracts for sale of Units shall be held in escrow in accordance with the requirements of Florida law, and may not be used by Borrower for construction or any other purpose, whether or not the contracts allow such use. Such deposits shall be held by an escrow agent duly qualified as such under Fla.Stat. Section 718.202 (the "Deposit Escrow Agent"), in an escrow account meeting the requirements of that statute.

**3.2.6.    Searches.** Such UCC, tax lien and judgment searches on Borrower and each owner of the Collateral pertaining to the jurisdictions in which the Collateral is located as determined pursuant to Article 9 of the UCC which Borrower or Guarantor owns property or otherwise conducts business.

**3.2.7.    Opinions.** An opinion of counsel of Borrower and Guarantor reasonably satisfactory to Lender, dated on or about the date of the Opening Disbursement and relating to

Loan No. ____

such matters with respect to the Loan Documents, the Loan, the Properties and otherwise with respect to the transaction contemplated hereby as Lender may request.

      **3.2.8.   Organization, Authorization and Good Standing.**   Such evidence of the due authorization, good standing and qualification to do business, of the Borrower Parties as Lender may reasonably request and certified copies of the Organizational Documents of each Borrower Party.

      **3.2.9.   Listing Agreements.**   Copies certified by Borrower as being true, correct and complete of each brokerage agreement for sales of Units.

      **3.2.10.   Loan Fee and Certain Costs of Lender.**   Payment of the Loan Fee and certain costs and expenses incurred by Lender to date in connection with the transactions contemplated herein, such as Lender's attorneys' fees and expenses and other fees and expenses paid or payable to appraisers, insurance consultants, environmental consultants and any and all other consultants.

      **3.2.11.   Appraisal.**   An Appraisal obtained at Borrower's sole cost and expense confirming to the satisfaction of Lender that the Opening Disbursement does not exceed: (i) 49% of the  Appraised Value of the Property as is; and (ii) the Loan Amount does not exceed 70% of the "as complete" value of the Project (in each case as determined by Lender, excluding interest and marketing costs), as of the date of the Opening Disbursement.

      **3.2.12.   Financial Statements.**   Current copies of Borrower's and Guarantor's financial statements as discussed in **Section 6.10** hereof, showing no material adverse change from those presented to Lender in support of the Loan request, together with copies of Guarantors' U.S. individual income tax returns for the past three years.

      **3.2.13. Omitted.**

      **3.2.14. Omitted.**

      **3.2.15.   Architect's or Engineer's Certificate.**   A certificate of the Architect and a certificate of the Engineer or other evidence satisfactory to Lender that (i) the Project is now, and upon construction in accordance with the Plans and Specifications and the Site Plan will be, in all material respects in compliance with all applicable building and zoning laws, ordinances, rules and regulations, without regard to and independently of any other property; and (ii) any and all required licenses and permits for and approvals of the Project to date have been issued by all governmental authorities and agencies (federal, state and local) and are in full force and effect; and (iii) all utilities and municipal services necessary for the Project are available or will, upon completion of the Project pursuant to the Plans and Specifications, be available, at the Property, and all permissions, permits and licenses required to tie the Project into such utilities and services have been obtained on an unconditional basis (other than the payment of customary tap-in fees), including, without limitation, all necessary water, sewer and drainage permits; and (iv) such other matters as Lender may reasonably require.

Loan No. _____

**3.2.16. Plans and Specifications.**  Two sets of the Plans and Specifications, certified to Lender as complete by the Architect and the Engineer, as appropriate.  Borrower will not cause or all any material changes or modifications in the Plans and Specifications or any material deviations therefrom without the prior written consent of Lender and of the Municipality and such governmental authority or agency if and to the extent required by the Municipality or such governmental authority or agency.

**3.2.17. Construction Contract.**  A construction contract (the "**Construction Contract**") with Broeren Russo, Inc. of Champaign, Illinois (the "**Contractor**") to construct the Project in accordance with the Plans and Specifications and all Permits, for the guaranteed maximum price of $6,124,840.00.  The Construction Contract must provide for a hard cost retainer equal to 10% of the Hard Costs (defined below) and be otherwise fully satisfactory to Lender.  Lender shall also have received and approved copies of all subcontracts in excess of $25,000.00 ("Major Subcontracts") for the performance of services or the supply of material in connection with the construction of the Improvements, certified by Borrower to be true and complete, and in all other respects fully satisfactory to Lender.

**3.2.18. Payment and Completion Bond.**  Lender shall receive a payment and completion bond on AIA form 312 and conforming to Fla.Stat. 713.23, covering the Construction Contract and each Major Subcontract in an amount and issued by a company satisfactory to Lender, and containing a dual oblige rider naming Lender as insured.  Lender shall receive an a copy of the Contractor's current general contractor's license issued by the State of Florida, AIA Contractor Qualification Statement for the Contractor, together with financial statements and copies of its federal income tax returns for the two prior years (collectively called "Contractor's Submissions").

**3.2.19. Construction Permits and Licenses.**  All Permits then required to be in place for all construction of the Improvements in accordance with the Plans and Specifications and the Site Plan.

**3.2.20. Lender's Inspector's Review.**  A statement confirming a satisfactory review of the Plans and Specifications and the Project Cost Analysis by Lender's Inspector, which are also subject to review by Lender, and showing the Project Cost Analysis to be complete and accurate and the Plans and Specifications and the Site Plan to be complete and sufficient for renovation and construction of the Improvements set forth herein.

**3.2.21. Construction Schedule.**  A schedule describing the various stages of renovation, construction and installation of the Improvements and the dates by which they are expected to be completed (the "**Construction Schedule**"), including final completion by the Completion Date.

**3.2.22. USA Patriot Act.**  Such information on the principals of the Borrower Parties as Lender believes is prudent to ensure compliance with the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001).  Lender hereby notifies Borrower that, pursuant to the requirements of the Act, it is required to obtain, verify and record the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Act.

Loan No. _____

**3.2.23. Other Requirements**.  Such other additional information regarding the Property or the Project that Lender may reasonably require.

**3.3.    Additional Disbursements of Loan Proceeds**.    Prior to making any disbursement after the Opening Disbursement, Borrower shall satisfy any and all requirements of Section 3.2 which were not provided to Lender in satisfactory form and content or otherwise satisfied prior to the Opening Disbursement, and shall satisfy each and all of the following conditions:

**3.3.1.** Each of the following shall constitute conditions precedent to any disbursement made by Lender (other than for carry costs as shown on the Project Cost Analysis) relating to the Additional Loan Amount:

**3.3.1.1.**    The amount of the Additional Loan Amount being disbursed for construction costs exclusive of any fees or interest (the **"Hard Costs"**) does not exceed 90% of the Hard Costs being paid with such disbursement, and the total of all disbursements of the Additional Loan Amount disbursed to date do not exceed 90% of the payments actually made by Borrower with respect to Hard Costs to date.

**3.3.1.2.**    Lender has received the following (at least seven Business Days prior to the proposed date of disbursement):

(a)    A completed Application for Payment that is consistent with the observations of Lender or Lender's consultant(s) while visiting the construction site.

(b)    Unless previously delivered to Lender, a statement from Borrower setting forth a description of all contracts or other agreements (and all amendments or modifications thereto) let by Borrower in amounts equal to or greater than $50,000, as well as a specification by name, address and amount of all parties to whom Borrower is obligated and as to whom Borrower then is requesting payment for labor, materials or services supplied for the construction of the Improvements, and any other expenses incident thereto, to the Premises or to the Loan.

(c)    Borrower's sworn certificate evidencing that all statements, invoices, bills and other expenses incident to acquisition of the Property and construction of the Improvements incurred to a specified date have been paid in full except for (a) retainage amounts held back pursuant to any construction contract or subcontract approved by the Lenders, (b) items to be paid from the proceeds of an advance requested in the Notice of Disbursement, and (c) items to be paid out of Borrower's Funds.

(d)    Such waivers and releases of lien on forms acceptable to the Title Company from each material dealer, fabricator, laborer, general contractor, subcontractor and sub-subcontractor who has done work or furnished materials for construction of the Improvements as set forth in each Notice of Disbursement and such sworn statements, affidavits, indemnities, bonds and other documents or instruments as

Loan No. _____

the Title Company deems necessary in order to provide the Lenders with an appropriate pending disbursement endorsement to the Title Insurance Policy (it being understood that the foregoing documents, if so requested, shall be delivered by Borrower directly to the Title Company in order to obtain the endorsements required by **Section 3.3.1.3**).

(e)     Unless previously delivered to Lender, a soft cost detail with copies of paid invoices and other evidence of payment of soft costs.

**3.3.1.3.**     Borrower has furnished or caused to be furnished to Lender an endorsement to the Title Insurance Policy covering the date of the disbursement and showing the Mortgage as a first priority lien subject only to Permitted Exceptions and such other title policy endorsements as Lender in its reasonable judgment may require.   With respect, however, to matters which by their nature cannot be waived or removed until final disbursement of the proceeds of the Loan, each such endorsement statement shall contain a so-called "date-down endorsement" and a so-called "construction lien interim certification" in form acceptable to Bank to cover the amount of the Loan proceeds then disbursed and to insure against mechanics' liens to the date of the disbursement.

**3.3.1.4.**     If required by Lender (unless previously delivered to Lender), Lender has received the following in form and substance reasonably acceptable to Lender:

(a)     Such bills, invoices, documents of title, vouchers, statements, payroll records, receipts and any other documents evidencing the total amount expended, incurred or due for any requested line items as Lender may request.

(b)     Evidence of Borrower's use of a lien release system acceptable to the Lenders for payments or disbursements to any contractor, subcontractor, materialman, supplier or lien claimant.

(c)     Evidence of Borrower's compliance with the provisions of **Section 4**.

(d)     A certificate of Substantial Completion of Construction from the Architect prior to the final retention disbursement, if applicable.

(e)     Any other document, requirement, evidence or information that Lender reasonably may request under any provision of the Loan Documents.

**3.3.1.5.**     Either (i) the Improvements have not been materially damaged and remain unrepaired, or (ii) Lender has not received receives funds from Borrower or insurance proceeds sufficient to pay for all repairs to the Improvements a timely manner.

**3.3.1.6.**     The Loan is not "out of balance" according to **Section 3.3.6** and Borrower has complied with its obligations under such **Section 3.3.6** and **Sections 9.12** and **9.13**.

Loan No. _____

3.3.1.7.    Lender and/or Lender's consultant has approved approve all work in place or to confirm that the undisbursed portion of the Loan is sufficient to complete the Improvements to be constructed therewith.

3.3.1.8.    **Architect's Certificate**.  A certificate of the Architect or other evidence satisfactory to Lender that (i) upon construction in accordance with the Plans and Specifications, the Project will be, in all material respects in compliance with all applicable building and zoning laws, ordinances, rules and regulations, without regard to and independently of any other property; and (ii) any and all required licenses and permits for and approvals of the Project to date have been issued by all governmental authorities and agencies (federal, state and local) and are in full force and effect; and (iii) such other matters as Lender may reasonably require.

3.3.1.9.    **Plans and Specifications**.    Two sets of the Plans and Specifications, certified to Lender as complete by the Architect, as appropriate.  Borrower will not cause or all any material changes or modifications in the Plans and Specifications or any material deviations therefrom without the prior written consent of Lender and of the Municipality and such governmental authority or agency if and to the extent required by the Municipality or such governmental authority or agency.

3.3.1.10.    **Construction Permits and Licenses**.  Those Permits then required to be in place for all construction in accordance with the Plans and Specifications and the Site Plan.

3.3.1.11.    **Lender's Inspector's Review**.  A statement confirming a satisfactory review of the Plans and Specifications and the Project Cost Analysis by Lender's Inspector, which are also subject to review by Lender, and showing the Project Cost Analysis to be complete and accurate and the Plans and Specifications and the Site Plan to be complete and sufficient for renovation and construction of the Improvements set forth herein.

3.3.2.    **Method of Disbursement**. Such disbursements shall be made to Borrower by deposit into an account designated by Borrower (which account need not be held by Lender).  Notwithstanding anything to the contrary contained herein, after the occurrence and during the continuance of an Event of Default, at Lender's option, any amount to be disbursed by Lender to enable Borrower to make payment to any third party payee may be paid directly to the appropriate payee at the Lender's sole and absolute discretion.  Notwithstanding any of the foregoing to the contrary, Lender has no obligation to monitor or determine Borrower's use or application of any disbursements.

3.3.3.    **Disbursement of Various Costs**.    The disbursement of all fees and expenses to be paid or reimbursed to Lender, including, without limitation, any loan fee, shall be made by Lender retaining such amounts; provided, however, that the Loan Fee shall be paid in cash from Borrower's sources other than Loan proceeds prior to closing of the Loan. Depletion of Loan funds for any such line item to be used to pay such amounts to Agent shall not release Borrower from any of Borrower's obligations under any of the Loan Documents, including, without limitation, the payment of fees and expenses incurred in connection with the Loans and the deposit of Borrower's Funds as required under this Agreement.

**3.3.4. Periodic Disbursement of Hard Costs (other than Hard Cost Contingency).** As construction progresses, the portions of the Loan allocated to the payment of the various Hard Costs as shown in the Project Cost Analysis shall be periodically disbursed to or for the benefit of Borrower, the Property or the Improvements for such Hard Cost items up to 90% of the maximum amount allocated for each such item less prior disbursements. The remaining 10% ("**Retention**") shall be disbursed to or for the benefit of Borrower, the Property or the Improvements upon completion of the applicable Improvements substantially in accordance with the Plans and Specifications and receipt by Lender of evidence of lien free (subject to the Permitted Exceptions) completion reasonably satisfactory to the Lender.

**3.3.5. Disbursements Evidenced by the Note.** All amounts disbursed by Lender hereunder, together with interest thereon, shall be evidenced by the Note and secured by the Collateral Documents.

**3.3.6. Line Item Balance; Reallocation.** Any undisbursed Loan funds, together with all sums, if any, to be provided by Borrower as shown in the Project Cost Analysis shall be at all times equal to or greater than the amount which Lender from time to time reasonably determines necessary, based on construction industry standards reasonably applied, to (i) pay, through completion, all costs of renovation, construction, marketing and sale or leasing of the Property and Improvements in accordance with the Loan Documents, (ii) pay all sums which may accrue under the Loan Documents prior to repayment of the Loan, and (iii) enable Borrower to perform and satisfy all of the covenants of Borrower contained in the Loan Documents. In no event shall Lender be required to disburse any portion of the Loan in excess of the portion of the Loan allocated to any particular item or category on the Project Cost analysis for the Loan; and the provisions of **Sections 9.12** and **9.13** are specifically applicable to each such item or category on the Project Cost Analysis. However, Lender reserves the right after any Event of Default, and at any other time that Lender deems it necessary or advisable to avoid impairment of its security, to make advances of amounts for such other purposes or in such different proportions as Lender determines, in its sole discretion. Borrower may not reallocate items of cost or change the Project Cost Analysis without the prior written consent of Lender, except as otherwise expressly provided in this Agreement with regard to Change Orders.

**3.4. Additional Conditions.** Notwithstanding anything to the contrary contained herein, the continued performance, observance and compliance by Borrower of and with all of the covenants, conditions and agreements of Borrower contained herein (whether or not non-performance constitutes an Event of Default) and in the other Loan Documents shall be further conditions precedent to any disbursements of the proceeds of the Loan. In addition, Lender shall not be required to disburse proceeds of the Loan at any time that (i) there exists an Event of Default or Potential Event of Default, (ii) any proceedings have been commenced or Borrower has received written notice of the commencement of proceedings by any public or quasi-public body to acquire any Property or any interest in any Property or any part thereof (other than a part which, in Lender's sole and absolute judgment, is immaterial) by eminent domain or by condemnation proceedings, (iii) any legislation has been passed or any suit or other proceeding has been instituted the effect of which is to prohibit, enjoin (or to declare unlawful or improper) or otherwise adversely affect, in Lender's sole and absolute judgment, Borrower's performance

of its obligations hereunder, or (iv) Lender has reasonable cause to believe that any Property might be subject to forfeiture under any RICO Related Law. Lender's refusal to disburse any proceeds of the Loan on account of the provisions of this Section shall not alter or diminish any of Borrower's other obligations hereunder or otherwise prevent any breach or default of Borrower hereunder from becoming an Event of Default. Each Application for Payment submitted by Borrower hereunder shall constitute an affirmation that Borrower has performed, observed and complied with its covenants, conditions and agreements contained herein in all material respects and that all representations and warranties made by Borrower hereunder continue to be true and correct.

## 4.    CONSTRUCTION.

**4.1.    The Project**. All renovation and construction shall be in all material respects in accordance with the Plans and Specifications, the Permits and with the Site Plan.

**4.2.    Timing of Construction of Improvements**. Borrower shall commence construction of the Improvements within 30 days after the date hereof. Thereafter, Borrower shall not permit cessation of work for a period in excess of 30 consecutive days without Lender's prior written consent, except for causes not the fault and beyond the reasonable control of Borrower and its general contractors, subcontractors and sub-subcontractors, and, in any event, Borrower shall not permit cessation of work for a period in excess of 45 consecutive days without Lender's prior written consent. Borrower shall cause the renovation, construction and installation of the Improvements to be performed in accordance with the Construction Schedule. Borrower shall complete construction of the Project on or before the Completion Date.

**4.3.    Force Majeure**. The time within which construction of any of the Improvements must be completed shall be extended for a period of time equal to the period of any delay directly affecting construction which is caused by fire, earthquake or other acts of God, strike, lockout, acts of public enemy, riot, insurrection or governmental regulation of the sale or transportation of materials, supplies or labor; provided, however, that Borrower shall furnish Lender with written notice satisfactory to Lender evidencing any such delay within 10 days from the occurrence of any such delay. In no event shall the time for completion of any of the Improvements be extended beyond the Maturity Date or more than 60 days beyond the original required completion date.

**4.4.    Engineer's Agreement**. Borrower and Engineer have entered into an agreement pursuant to the terms and conditions of which Engineer has designed or is to design certain of the Improvements. Borrower shall require Engineer to perform in accordance with the terms of such agreement and shall not materially amend, modify or alter the responsibilities of Engineer under the agreement without Lender's prior written consent.

**4.5.    Architect's Agreement**. Borrower and Architect have entered into an agreement pursuant to the terms and conditions of which Architect has designed or is to design certain of the Improvements. Borrower shall require Architect to perform in accordance with the terms of such agreement and shall not materially amend, modify or alter the responsibilities of Architect under the agreement without Lender's prior written consent.

Loan No. _____

### 4.6. **Plans and Specifications**.

**4.6.1. Changes; Lender Consent**.   Except as otherwise provided in this Agreement, Borrower shall not make any changes in the Plans and Specifications without Lender's prior written consent if such change:  (i) constitutes a material change in the building material or equipment specifications, or in the architectural or structural design, value or quality of any of the Improvements; (ii) would result in a Change Order requiring Lender's consent; or (iii) would affect the structural integrity, quality of building materials, or overall efficiency of operating systems of the Improvements.  Without limiting the above, Lender agrees that Borrower may make minor changes in the Plans and Specifications without Lender's prior written consent, provided that such changes do not violate any of the conditions specified herein.  Borrower shall at all times maintain, for inspection by Lender, a full set of working drawings of the Improvements to be renovated or newly constructed or installed.

**4.6.2. Changes; Submission Requirements**.  If any Change Order requiring the consent of Lender pursuant to **Section 4.7** is involved, Borrower shall submit any proposed change in the Plans and Specifications to Lender at least 10 days prior to the commencement of construction or other work relating to such proposed change.  Requests for any change which requires consent shall be accompanied by working drawings and a written description of the proposed change, submitted on a change order form acceptable to Lender, signed by Borrower and, if required by Lender, also by the Architect and the Engineer.  At its option, Lender may require Borrower to provide evidence satisfactory to Lender of the cost and time necessary to complete the proposed change.

**4.6.3. Consent Process**.  Borrower acknowledges that Lender's review of any changes and required consent may result in delays in construction and hereby consents to any such delays, provided that Lender conducts such review within a reasonable time frame.

**4.7. Change Orders**.  Borrower shall not approve or allow any Change Orders without the prior written consent of Lender, except that Lender's prior written consent shall not be required with respect to individual Change Orders involving a cost increase of less than $10,000, until the aggregate increased costs reflected by all Change Orders theretofore issued and not consented to by Lender exceed $50,000, at any time.  Notwithstanding the foregoing, Borrower shall not be required to obtain Lender's consent to any Change Order paid for entirely out of Borrower's Funds, although Borrower shall deliver notice thereof to Lender reasonably promptly after it occurs.  Borrower shall obtain the Municipality's prior written approval of any Change Order which requires the Municipality's approval, whether or not Lender's approval is required.  Lender shall be furnished with copies of all Change Orders issued over $10,000 whether or not Lender's prior written consent with respect thereto has been required hereunder or obtained pursuant hereto.

**4.8. Contractors; Construction Information**.  Each calendar quarter, within 10 days after Lender's written request and to the extent such information is not contained in Borrower's Applications for Payment, Borrower shall deliver to Lender from time to time in a form acceptable to Lender:  (a) a list detailing the name, address and phone number of each contractor, subcontractor and material supplier to be employed by Borrower or used by Borrower for

renovation, construction or installation of the Improvements together with the dollar amount, including changes, if any, of each contract and subcontract, and the portion thereof, if any, paid through the date of such list; (b) copies of each contract and subcontract identified in such list, including any changes thereto for the following subcontracts:  window and door, carpentry, HVAC, plumbing, drywall and electrical; and (c) a cost breakdown of the projected total cost of renovating, constructing and installing the Improvements, and that portion, if any, of each cost item which has been incurred.  Borrower agrees that Lender has the right, but shall not be obligated, to disapprove any general contractor or any major subcontractor (as reasonably determined by Lender) which, in Lender's good faith determination, is deemed financially or otherwise unqualified; provided, however, that the absence of any such disapproval shall not constitute a warranty or representation of qualification by Lender.  Lender shall have the right to contact any contractor, subcontractor or material supplier to discuss the course of construction.

**4.9.   Prohibited Contracts.**  Without Lender's prior written consent, Borrower shall not contract for any materials, furnishings, equipment, fixtures or other parts or components of the Improvements, if any third party shall retain any ownership interest (other than lien rights created by operation of law) in such items after their delivery to the Property and Improvements. Borrower shall have five days to effect the removal of any such retained interest.

**4.10.   Construction Liens.**  If a claim of a construction lien is recorded which affects the Property or Improvements, Borrower shall, within 20 days after Borrower becomes aware of such recording or service or within five days of Lender's demand, whichever occurs first:  (a) pay and discharge the claim of lien; (b) effect the release thereof by recording or delivering to the appropriate governmental body a surety bond in sufficient form and amount; (c) cause the Title Company to insure over such claim of lien by endorsement to the Title Insurance Policy; or (d) provide Lender with other assurance which Lender deems, in its sole discretion, to be satisfactory for the payment of such claim of lien and for the full and continuous protection of Lender from the effect of such lien.

**4.11.   Construction Responsibilities.**  Borrower shall renovate, construct and install the Improvements in a workmanlike manner in all material respects according to the Plans and Specifications and the recommendations of any engineer set forth in a report delivered to Lender prior to the Opening Disbursement or specifically approved by Lender in writing thereafter. Borrower shall comply with all applicable laws, ordinances, rules, regulations, building restrictions, orders, permits, recorded covenants and restrictions, and requirements of all regulatory authorities having jurisdiction over the Property or Improvements.  Borrower shall be solely responsible for all aspects of Borrower's business and conduct in connection with the Property and Improvements, including, without limitation, for the quality and suitability of the Plans and Specifications and their compliance with all governmental requirements, the supervision of the work of construction, the qualifications, financial condition and performance of all architects, engineers, contractors, material suppliers, consultants and property managers, and the accuracy of all applications for payment and the proper application of all disbursements. Lender is not obligated to supervise, inspect or inform Borrower or any third party of any aspect of the construction of the Improvements or any other matter referred to above.  Borrower shall remedy, in a manner satisfactory to the Municipality and to Lender, such portions or aspects of the construction contemplated herein as may be determined to be not substantially in compliance

with the approved Plans and Specifications, the Site Plan or any such laws, ordinances, orders, permits, rules and regulations. In the event Borrower receives any notice of any such noncompliance, Borrower shall promptly deliver a copy of same to Lender, and Borrower shall have the right to contest in accordance with applicable law any such notice of noncompliance delivered or given by the Municipality as follows: Borrower shall deliver to Lender a copy of said notice of non-compliance within five days after Borrower's receipt thereof, together with a statement by Borrower declaring its intent to contest the same; Borrower shall have 60 days from the date of such delivery to Lender in which to successfully resolve the subject condition. Notwithstanding the foregoing, in no event shall Borrower be entitled to contest any determination of noncompliance made or given by Lender.

**4.12.   Delay.** Borrower shall promptly notify Lender in writing of any event which is likely to cause a delay or interruption of construction, or the timely completion of construction, in violation of the terms and conditions of this Agreement. The notice shall specify the particular work delayed, and the cause and a reasonable estimate of the period of each delay.

**4.13.   Inspections.** Borrower shall permit, and shall cooperate with Lender in arranging for, inspections of the Property from time to time by Lender's inspector and any other representatives of Lender. The costs and expenses involved in any and all such inspections shall be paid by Borrower. In the event that Lender's inspector or another representative furnishes Lender with reports covering such inspections, Lender may, but is not under any obligation whatsoever to, furnish Borrower with copies of any of said reports. Borrower acknowledges and agrees that (i) all of such inspections and reports shall be made for the sole benefit of Lender and not for the benefit of Borrower or any third party, and none of Lender, Lender's inspector or any other of Lender's representatives assume any responsibility or liability (except to Lender) by reason of such inspections, reports or the furnishing of any of such reports to Borrower, (ii) Borrower shall not rely upon any of such inspections or reports for any purpose whatsoever, and (iii) such inspections and the furnishing of any of such reports to Borrower shall not constitute a waiver of any of the provisions of this Agreement or any of the obligations of Borrower hereunder. Borrower further acknowledges and agrees that none of Lender, Lender's inspector or any other of Lender's representatives shall be deemed in any way responsible for any matters related to design or construction of the Improvements.

**5.   INSURANCE.**

**5.1.   Types of Policies.** Borrower, at its sole cost and expense, shall insure or cause to be insured and keep insured the Property against such perils and hazards, and in such amounts and with such limits, as Lender may from time to time require and, in any event, including, without limitation, the following coverages with respect to the Property:

**5.1.1.   All Risk.** Insurance against loss to the Property which, during any construction, shall be on an "All Risk" perils "Builders' Risk," monthly reporting or non-reporting "Completed Value" form and, after completion of construction, shall be on an "All Risk" policy form covering, in each case, insurance risks of all physical loss "Causes of Loss - Special Form," including theft, terrorism, and insurance against such other risks as Lender may reasonably require. Such policies shall be in amounts equal to the full replacement cost of the

Loan No. _____

Property (including the related Improvements, and specifically, Borrower's interest in any leasehold improvements).

**5.1.2.  Flood.**  If the Property is now, or at any time while any obligation of Borrower hereunder remains outstanding shall be, situated in any area which an appropriate governmental authority designates as a Special Flood Hazard Area, insurance against loss or damage by flood or mud slide in compliance with the Flood Disaster Protection Act of 1973, as amended from time to time, in amounts acceptable to Lender.

**5.1.3.  Public Liability.**  Commercial general public liability insurance against death, bodily injury and property damage arising in connection with the Property with limits of not less than $5,000,000 per occurrence.  Such policy shall be written on an occurrence form and shall list Borrower as the named insured, shall designate thereon the location of the Property and shall have such limits as Lender may reasonably require.

**5.1.4.  Contractor's Insurance.**  During the entire period of renovation and construction of any of the Improvements, Borrower shall cause to be furnished to Borrower and, upon request by Lender, to Lender certificates from the insurance carrier for the Project general contractor evidencing worker's compensation, employers' liability, commercial auto liability, excess umbrella liability coverage and commercial general liability insurance (including contractual liability and completed operations coverage) written on an occurrence form, with such general liability insurance limits as Lender may reasonably require.  Borrower shall be named as an additional insured under such liability policies.  Borrower shall cause each subcontractor to maintain commercial general liability, commercial automobile liability, workers' compensation, employers' liability and excess umbrella liability coverage in form and amount reasonably satisfactory to lender.

**5.1.5.  Other Insurance.**  Such other insurance relating to the Property and the use and operation thereof as Lender may, from time to time, reasonably require.

**5.2.  Policy Requirements.**  All insurance shall be carried in companies acceptable to Lender, and all policies shall name Lender as an additional insured, mortgagee, and loss payee. Furthermore, all insurance shall be in form and content reasonably acceptable to Lender, provide 30 days' advance written notice to Lender before any cancellation, adverse material modification or notice of non-payment and, to the extent limits are not otherwise specified herein, contain deductibles which are in amounts acceptable to Lender.  Lender shall be specifically named in all policies as an additional insured.  All physical damage policies and renewals shall contain a standard mortgage clause naming Lender as mortgagee, which clause shall expressly state that any breach of any condition or warranty by Borrower shall not prejudice the rights of Lender under such insurance, as well as a loss payable clause in favor of Lender for personal property, contents, inventory and equipment.  No additional parties shall appear in the mortgage or loss payable clause with respect to the Property without Lender's prior written consent.  All evidence of insurance shall reference the specific projects being covered by name and address and shall otherwise be in form and substance acceptable to Lender.  All deductibles shall be in amounts acceptable to Lender.



Loan No. _____

**5.3.    Notice; Evidence of Renewal.**  Any notice pertaining to insurance and required pursuant to this Section shall be given in the manner provided in **Section 12.8** and at any additional address of which Lender gives Borrower prior written notice.  Borrower shall use its best efforts to deliver to Lender evidence of renewal satisfactory to Lender at least five Business Days before the expiration of existing policies or any prior renewal thereof.  If Lender has not received satisfactory evidence of such renewal or substitute insurance in the time frame herein specified, Lender shall have the right, but not the obligation, to purchase such insurance without prior notice to Borrower.  Any amounts so disbursed by Lender pursuant to this Section shall be a part of the Loan and shall bear interest at the Default Rate provided in the Note.  Nothing contained in this Section shall require Lender to incur any expense or take any action hereunder, and inaction by Lender shall never be considered a waiver of any right accruing to Lender on account of this **Section 5.**

**5.4.    Separate Insurance.**  Borrower shall not carry any separate insurance on the Property concurrent in kind or form with any insurance required hereunder or contributing in the event of loss without Lender's prior written consent and, in the event Lender grants its consent, any such policy shall nevertheless have attached thereto a standard non-contributing mortgagee clause, with loss payable to Lender, and shall otherwise meet all other requirements set forth in this Section.

**6.    GENERAL REPRESENTATIONS AND WARRANTIES.**    Borrower hereby covenants, represents and warrants to Lender as follows:

**6.1.    Authority.**  Each of the Borrower Parties has full right, power and authority to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is a party and any other documents and instruments to be executed and delivered by such Borrower Party pursuant to this Agreement.  The Loan Documents and any other documents and instruments to be executed and delivered by the Borrower Parties pursuant to this Agreement, when executed and delivered pursuant hereto, will constitute the duly authorized, valid and legally binding obligations of such parties and will be enforceable strictly in accordance with their respective terms, subject to the effect of bankruptcy and other laws affecting the rights of creditors generally.

**6.2.    Formation.**  Each Borrower Party which is not an individual or general partnership is a corporation, limited liability company or limited partnership, is duly formed, validly existing and in good standing under the laws of the state under the laws of which it was formed.  Each Borrower Party that is an entity has qualified to do business in every state where such qualification is required.  Borrower has furnished Lender with a certified true, complete and correct copy of the Organizational Documents of each Borrower Party.  No Borrower Party shall modify, amend, terminate or otherwise change any of the Organizational Documents of any Borrower Party without Lender's consent.

**6.3.    No Default.**  None of the Borrower Parties is in default under any contract, agreement or commitment to which it is a party, the effect of which would adversely affect Borrower's or any of the Borrower Parties' performance of its respective obligations pursuant to and as contemplated by the terms and provisions of this Agreement or any of the other Loan

Documents. The execution and delivery of the Loan Documents and any other documents or instruments to be executed and delivered by the Borrower Parties pursuant hereto, the consummation of the transactions herein or therein contemplated, and compliance with the terms and provisions hereof or thereof, will not (i) to the best of Borrower's knowledge, violate any presently existing provisions of law or any presently existing applicable regulation, order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality, or (ii) conflict or be inconsistent with, or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in any acceleration of any obligations under, any indenture, mortgage, deed of trust, instrument, documents, agreement or contract of any kind to which any of the Borrower Parties is a party or by which any Collateral any of the Borrower Parties may be bound.

6.4. **No Litigation**. There are no petitions, actions, suits or proceedings pending or, to the best of Borrower's knowledge, threatened against or affecting any Collateral before any court or governmental, administrative, regulatory, adjudicatory or arbitrational body or agency of any kind which will materially adversely affect the performance by Borrower of its obligations pursuant to and as contemplated by the terms and conditions of this Agreement or the other Loan Documents.

6.5. **True and Complete Information**. Neither this Agreement, nor any other Loan Document, nor any document, financial statement, credit information, certificate or other statement required herein furnished to Lender by any Borrower Party contains any untrue statement of a material fact or omits to state a material fact relating to the Collateral or any matter covered by this Agreement. To the best of Borrower's knowledge, no document, financial statement, credit information, certificate or other statement prepared by any party other than Borrower and furnished to Lender contains any untrue statement of a material fact or omits to state a material fact relating to this Agreement. To the best of Borrower's knowledge, there is no fact that Borrower has not disclosed to Lender in writing that could materially adversely affect the property, business or financial condition of any Borrower Party.

6.6. **Usury**. The Loan constitutes a transaction within the meaning of 815 Illinois Compiled Statutes, 205 Section 4(1), and neither the amounts to be received by Lender as interest under the Note nor the Loan Fee is usurious or illegal under applicable law.

6.7. **Non Foreign Status**. No Borrower Party is a nonresident alien for purposes of U.S. income taxation or is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as said terms are defined in the Internal Revenue Code and Income Tax Regulations).

6.8. **ERISA**. Borrower is not and, for so long as any obligation of Borrower hereunder remains outstanding, shall not be an "employee benefit plan" within the meaning of section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, and Borrower's assets do not constitute assets of any such plan.

6.9. **RICO**. There are no suits, actions or proceedings pending or threatened against any Borrower Party or any of the principals thereof under a RICO Related Law.

Loan No. _____

**6.10.    Financial Statements.**    Borrower has heretofore furnished Lender a copy of Borrower's and Guarantors' current financial statements.    Such financial statements were prepared on a GAAP basis in a manner consistent with Borrower's preparation method for the prior fiscal year and present fairly the financial condition of Borrower and each Guarantor as of the date thereof and the results of operations for the period then ended and otherwise comply with **Section 10.1**.    Since the date of such financial statements, there has been no material adverse change in Borrower's or Guarantors' business or financial condition not disclosed in writing to Lender.    Neither Borrower nor any Guarantor has any contingent liabilities not provided for or disclosed in said financial statements, except as disclosed in writing to Lender. Each Guarantor and Borrower has the financial capacity to perform and discharge each and every one of its respective obligations and liabilities under this Agreement and any of the other Loan Documents as it becomes due.

**6.11.    Property Specific**.    With respect to the Property:

**6.11.1.    Title**.    Borrower has good, marketable and indefeasible title in fee simple to the Property, subject to no liens, claims, encumbrances, rights of others, conditions or exceptions other than the Permitted Exceptions and any additional matters specifically approved by Lender in writing.

**6.11.2.    Utilities**.    All water, storm and sanitary sewer facilities and utility services necessary and sufficient for the operation of the Property are currently available and in good working order.

**6.11.3.    Real Estate Taxes**.    The Property is and shall remain taxed separately for real estate tax purposes without regard to any other real property.    There is no pending reassessment of real estate taxes or pending appeal of any such reassessment.

**6.11.4.    Annexation**.    The Property is located in its respective Municipality and has been properly annexed thereto.

**6.11.5.    Zoning**.    The Property is duly and validly zoned for the uses to which the Property is now being put. [the development of the entire Project.    Said zoning is unconditional, in full force and effect and no attacks or challenges are pending or threatened with respect thereto.    Said zoning permits the renovation, construction and installation of all of the Improvements on the Property in accordance with the Plans and Specifications and the Site Plan. Neither said zoning nor any other right to construct on or otherwise use the Property is in any way dependent upon or related to any real estate other than the Property [except with respect to any easements granted under any REA which has been approved by Lender in its sole and absolute discretion].

**6.11.6.    Condemnation**.    Borrower has not received any notice from any governmental or quasi-governmental body or agency or from any person or entity with respect to, and to the best of Borrower's knowledge, there is no actual or threatened taking of the Property, or any portion thereof, for any public or quasi-public purpose by the exercise of the right of condemnation or eminent domain.

Loan No. _____

**6.11.7.    Roads**.  The Property abuts at least one publicly dedicated street which gives the Property (and all users thereof) complete, unencumbered and unrestricted access, except that vehicular access shall be limited to those locations along such public streets at which curb cuts shall be permitted by the relevant Municipality, and shall be sufficient and fully available for the full utilization of the Property for its intended purposes.

**6.11.8.    Compliance With Laws**.  The use of the Property does not [, and the use of the Property after construction of the Improvements will not violate any presently existing applicable statute, law, regulation, rule, ordinance or order of any kind whatsoever (including, without limitation, any presently existing zoning or building laws or ordinances, any presently existing environmental protection laws or regulations, or any presently existing rules, regulations or orders of any governmental agency), or any building permit issued with respect to the Property or any condition, easement, right-of-way, covenant or restriction of record affecting the Property, which violation could, in Lender's reasonable opinion, impair Borrower's ability to keep or perform any of its agreements, undertakings, obligations, covenants or conditions under this Agreement.

**6.11.9.    ADA Compliance**.  The Improvements on the Property are, and shall be maintained, in strict accordance and full compliance with all of the requirements of the ADA and any similar state or local law, to the extent same are applicable thereto.  Borrower shall be responsible for all ADA related compliance costs.

**6.11.10.    Flood Plain and Wetlands**.  No portion of the Property is located (i) in an area designated by FEMA as a Special Flood Hazard Area, (ii) in an area classified as "**wetlands**" or (iii) in an area designated by any federal, state or local governmental or quasi-governmental agency as a "**floodway**," special flood hazard area or flood plain.

**6.11.11.    No Defaults Under Agreements Affecting the Property**.  There exist no monetary defaults or other material defaults beyond any applicable cure period under any (i) agreement (written or oral) relating to the Property (including, without limitation, any REA) between Borrower, any Manager their respective Affiliates, or (ii) under any Lease.

**6.11.12.    Associations**.  Borrower will comply with all obligations arising from membership in any association imposed on the owner of its Property pursuant to any recorded instrument to which title to the Property is subject, or otherwise imposed on the Borrower under any such instrument.  Borrower shall promptly deliver to Lender copies of any notice of default relating to any payment or other obligation under any such instrument which it may receive.  In the event Lender receives notice of any such payment default from whatever source, Lender may elect (but shall have no obligation) to make such payment on behalf of the Borrower, in which event the amount so paid, as determined by Lender in its sole discretion, shall be deemed a disbursement of Loan proceeds and become additional indebtedness under the Note.

**6.11.13.    Condition of Property**.  Borrower represents and warrants that the Property is not in violation of any applicable laws, regulations or codes, and is not in need of any deferred maintenance, repairs or replacements in excess of $10,000.00.

Loan No. _____

**6.12.** **Agreements Affecting the Properties**. Borrower has not entered into and, to the best of Borrower's knowledge, there are no, contracts or agreements (either oral or written) affecting any part of the Property, including, without limitation, Leases, tenancies, property management agreements or other contracts or agreements relating to the maintenance, development or management thereof, other than contracts and agreements of which Borrower has heretofore furnished Lender true and complete copies. No Borrower Party shall enter into any contract or agreement relating to the management of the Property without the prior written consent of Lender (not to be unreasonably withheld or delayed) and, if required by Lender, the applicable Borrower shall execute a collateral assignment to Lender of such Borrower Party's right, title and interest in and to any such property management agreement.

**6.13.** **Brokerage Commissions**. No brokerage fees or commissions are payable by Borrower in connection with the acquisition of any part of the Property or with the Loan.

**6.14.** **Loan Purposes**. The Loan is not being made for the purpose of purchasing or carrying margin stocks, and Borrower agrees to execute, or cause to be executed, all instruments necessary to comply with all of the requirements of Regulation U of the Federal Reserve System. The Loan is an exempt transaction under the Truth-in-Lending Act.

**6.15.** **Single Purpose Entity**. The Borrower is and shall remain a single purpose entity which (i) is formed or organized solely for the purpose of acquiring and directly holding an ownership interest in the Property and activities incidental thereto, (ii) does not and will not engage in any business unrelated to the Property, (iii) does not and will not have any assets other than those related to its interest in the Property or any indebtedness other than as permitted by the Loan Documents, (iv) has its own separate books and records and keeps its own accounts, in each case which are separate and apart from the books and records and accounts of any other entity, (v) is subject to all of the limitations on powers set forth in its organizational documentation, (vi) holds and will hold itself out as being an entity separate and apart from any other entity, (vii) except in connection with a Guaranty, has not at any time since its formation assumed or guaranteed and will not assume or guaranty the liabilities of any other entity, (viii) has not at any time since its formation acquired and will not acquire obligations or securities of any other entity, (ix) has not at any time since its formation made and will not make loans to any other entity, and (x) does not and will not have any subsidiaries.

**6.16.** **No Unbudgeted Fees**. There are no unpaid impact fees, recapture fees, utility tap-on or connection fees, permit fees or any other material cost of renovating, constructing and installing the Improvements not reflected in the Project Cost Analysis.

**6.17.** **Project Cost Analysis**. To the best of Borrower's knowledge, the Project Cost Analysis is true and complete and the proceeds of the Loan, when combined with Borrower's Funds contributed or to be contributed for the Project, will be sufficient to finally, fully and properly complete the construction of the Project in accordance with the terms and conditions hereof.

**6.18.** **Collateral Support**. At all times during the construction and renovation of the Property as contemplated by the Plans and Specifications and the Site Plan, the collateral support

Loan No. _____

of the Improvements shall be in compliance with the requirements of applicable law and the recommendations of the Engineer.

**6.19.    Construction Schedule**.  The Construction Schedule is a good faith reasonable estimation by Borrower of the stages of completion of renovation, construction and installation of the Improvements and the completion dates described thereon.

**6.20.    Representations and Warranties Generally**.    The representations and warranties set forth in this Agreement or in any other Loan Document will be true and correct on the date of this Agreement and at the dates of all disbursements of the Loan, and each request for funding submitted by Borrower hereunder shall constitute an affirmation by Borrower that such representations and warranties are true and correct as of the date of such request for funding with the same force and effect as if made on such date.  All representations, warranties, covenants and agreements made in this Agreement or in any certificate or other document delivered to Lender by or on behalf of Borrower pursuant to or in connection with this Agreement shall be deemed to have been relied upon by Lender notwithstanding Lender's review of any documents or materials delivered by Borrower to Lender pursuant to the terms hereof and notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf (and Borrower hereby acknowledges such reliance by Lender in making the Loan and all disbursements thereunder) and, furthermore, shall survive the making of any or all of the disbursements of proceeds of the Loan and continue in full force and effect as long as there remains unperformed any obligations to Lender hereunder or under any of the other Loan Documents.

**6.21.    Loan to Cost**.  The Loan Amount is not more than 75% of the total cost of the Project.

**7.    HAZARDOUS MATERIALS**.

**7.1.    Special Representations and Warranties**.  Without in any way limiting the other representations and warranties set forth in this Agreement, and after reasonable investigation and inquiry, Borrower hereby specially represents and warrants to the best of Borrower's knowledge as of the date of this Agreement as follows, with respect to the Property:

**7.1.1.  Hazardous Materials**.  Except for products and material of a type commonly used or otherwise present in properties similar to the Property, in quantities and in a manner which complies with Hazardous Materials Laws, defined below ("Common Materials"), the Property is not and has not been a site for the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of any oil, flammable explosives, asbestos, urea formaldehyde insulation, polychlorinated biphenyls, radioactive materials, hazardous wastes, toxic or contaminated substances or similar materials, including, without limitation, any substances which are "hazardous substances," "hazardous wastes," "hazardous materials" or "toxic substances" under the Hazardous Materials Laws, as described below, and/or other applicable environmental laws, ordinances or regulations (collectively, the "**Hazardous Materials**").

**7.1.2.  Hazardous Materials Laws**.  The Property is in compliance with all laws, ordinances and regulations relating to Hazardous Materials and with any permit, license or

requirement pertaining to the protection, preservation, conservation or regulation of the environment which relates to the Property ("**Hazardous Materials Laws**"), including, without limitation: the Clean Air Act, as amended, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 et seq.; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 et seq.; the Comprehensive Environment Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986), 42 U.S.C. Section 9601 et seq.; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651, the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 et seq.; the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; and all comparable state and local laws, laws of other jurisdictions or orders and regulations.

      **7.1.3.    Hazardous Materials Claims**.    There are no claims or actions ("**Hazardous Materials Claims**") pending or threatened, nor have there been any such claims or actions in the past, against Borrower, any Borrower Party or the Property by any governmental entity or agency or by any other person or entity relating to Hazardous Materials or pursuant to the Hazardous Materials Laws.

      **7.1.4.    Storage Tanks**.    No storage tanks (including, without limitation, petroleum or heating oil storage tanks), underground or above-ground, are present on or under the Property.

      **7.1.5.    Waters of the United States**.    No part of the Property contains "waters of the United States", as defined in 33 CFR 328.  Borrower shall not discharge dredged or fill material into waters of the United States as such activity is described and regulated by Section 404 of the Clean Water Act, 33 U.S.C. 1344.

    **7.2.    Covenants**.    Borrower agrees as follows (Where references are made to "the Property" or the "Improvements" they are intended to refer to each Property and the Improvements on such Property, respectively.):

      **7.2.1.        No Hazardous Activities**.    Borrower shall not cause or permit the Property or Improvements to be used as a site for the use, generation, manufacture, storage, treatment, release, discharge, disposal, transportation or presence of any Hazardous Materials, other than Common Materials in quantities and in a manner which complies with Hazardous Materials Laws ("**Common Materials**").

      **7.2.2.        Compliance**.    Borrower shall comply and cause the Property and the Improvements to comply with all Hazardous Materials Laws.

      **7.2.3.        Notices**.    Borrower shall immediately notify Lender in writing of:  (i) the discovery of any Hazardous Materials on, under or about the Property or Improvements, other than Common Materials; (ii) any knowledge by Borrower that the Property or Improvements do not comply with any Hazardous Materials Laws; and (iii) any Hazardous Materials Claims.  Borrower shall promptly cure and have dismissed with prejudice all

Loan No. _____

Hazardous Materials Claims pursuant to applicable law, and Borrower shall keep the Property free of any encumbrance arising from any judgment, liability or lien imposed pursuant to any Hazardous Materials Claims.   Notwithstanding the foregoing sentence, Borrower may, diligently, in good faith and by appropriate legal proceedings, contest any such Hazardous Materials Claims provided (i) Borrower first furnishes to Lender such deposits or other collateral as Lender, in its sole discretion, deems sufficient to fully protect Lender's interests, (ii) such contest shall have the effect of preventing any threatened or pending sale or forfeiture of all or any portion of the Property or the loss or impairment of Lender's lien and security interests in and to the Property, and (iii) such contest will not cause Lender to incur any liability, in Lender's sole judgment.   Borrower shall permit Lender, at Lender's option, to appear in and to be represented in any such contest and shall pay upon demand all expenses incurred by Lender in so doing, including, without limitation, attorneys' fees and expenses.

      **7.2.4.**   **Remedial Action**.   In response to the presence of any Hazardous Materials (other than Common Materials used and stored in compliance with all Hazardous Materials Laws) on, under or about the Property or Improvements, Borrower shall immediately take, at Borrower's sole expense, all remedial action required by any Hazardous Materials Laws or any judgment, consent decree, settlement or compromise in respect to any Hazardous Materials Claims.

      **7.2.5.**   **Exceptions**.   The obligations of Borrower set forth in this Section shall not be applicable to any noncompliance with the terms and conditions hereof to the extent resulting directly from the actions of Lender after Lender acquires title or actual possession to the Property pursuant to a foreclosure under the Mortgage.

      **7.3.**   **Inspection By Lender**.   Borrower shall provide such information and certifications which Lender may reasonably request from time to time (whether before or after the commencement of a nonjudicial or judicial foreclosure proceeding) to monitor Borrower's compliance with this Section for the sole purpose of protecting Lender's interest in the Property and Improvements.   To protect its interest in the Property and Improvements, Lender shall have the right, but not the obligation, at any time upon reasonable prior notice to Borrower, to enter upon the Property, take samples, review Borrower's books and records, interview Borrower's employees and officers, and conduct such other activities as Lender, in its sole and absolute discretion, deems appropriate.   Borrower shall cooperate fully in the conduct of such an audit.   If Lender decides to conduct such an audit because of (i) a Hazardous Material Claim, (ii) the possibility that Lender may take possession of or title to the Property (or any part thereof) after an Event of Default, (iii) a material change in the use of the Property which, in Lender's sole and absolute judgment, increases the risk to its interest in such Property and Improvements, or, (iv) the introduction of Hazardous Material to any Property, then Borrower shall pay upon demand all costs and expenses connected with such audit, as determined by Lender in its sole and absolute discretion, which, until paid, shall become additional indebtedness under the Note secured by the Loan Documents.   Nothing in this Section shall give or be construed as giving Lender the right to direct or control Borrower's actions in complying with Hazardous Materials Laws.

Loan No. ____

**7.4.**　**Lender's Right to Rely.**　Lender is entitled to rely upon Borrower's representations, covenants, agreements and warranties contained in this Section despite any independent investigations by Lender or its consultants or other representatives.　Borrower shall take all necessary actions to determine for itself, and to remain aware of, the environmental condition of the Property.　Borrower shall have no right to rely upon any independent environmental investigations or findings made by Lender or its consultants or other representatives unless otherwise stated in writing therein and agreed to in writing by Lender.

**7.5.**　**Hazardous Materials Indemnity.**　Borrower hereby agrees to defend, indemnify and hold harmless Lender, its directors, officers, employees, agents, successors and assigns (including, without limitation, any participants in the Loan) from and against any and all losses, damages, liabilities, claims, actions, judgments, court costs and legal or other expenses (including, without limitation, attorney's fees and expenses) which Lender may incur as a direct or indirect consequence of (a) any Hazardous Material Claim, (b) any misrepresentation, inaccuracy or breach of any representation, warranty or covenant contained or referred to in this **Section 7**, or (c) the use, generation, manufacture, storage, disposal, threatened disposal, transportation or presence of Hazardous Materials in, on, under or about the Property or Improvements (collectively, the "**Indemnified Matters**").　The Indemnified Matters shall include, without limitation:　(i) the reasonable costs, whether foreseeable or unforeseeable, of any repair, cleanup or detoxification of the Property which is required by any governmental entity or is otherwise necessary to render the Property in compliance with all laws and regulations pertaining to Hazardous Materials; (ii) all other direct or indirect consequential damages (including, without limitation, any third party tort claims or governmental claims, fines or penalties against Lender, any corporation controlled by Lender, or any of their respective directors, officers, employees, agents, successors or assigns); and (iii) all court costs and reasonable attorneys' fees and expenses paid or incurred by Lender, any entity controlled by Lender, or any of their respective directors, officers, employees, agents, successors or assigns relating to the subject matter hereof.　Borrower shall immediately pay to Lender upon demand any amounts owing under this indemnity, together with interest from the date the indebtedness arises until paid at the rate of interest applicable to the principal balance of the Note.　Borrower's duty and obligations to defend, indemnify and hold harmless Lender shall survive the cancellation of the Note and the release, reconveyance or partial reconveyance of any of the Mortgages.　Notwithstanding anything contained herein to the contrary, the above indemnities shall not apply to the extent that a matter results solely and directly from the actions of Lender and first arises after the date that actual possession or title to the Property is taken by Lender, Lender's nominee or a successful bidder at a foreclosure sale.

**8.**　**OMITTED.**

**9.**　**GENERAL COVENANTS, CONDITIONS AND AGREEMENTS.**　Borrower hereby further covenants and agrees with Lender as follows:

**9.1.**　**Compliance with Loan Documents.**　Borrower shall comply with, observe and timely perform each and every one of the covenants, agreements and obligations under each and every one of the Loan Documents and any other loan documents to which it is a party.

Loan No. _____

**9.2.    Use of the Property**.  Borrower shall not make, suffer or permit any use of the Property for any purpose other than a residential condominium project.

**9.3.    Leases and Other Transfers**.  Borrower shall not, without the prior written consent of Lender (to be granted or withheld in Lender's sole discretion), enter into any new Lease, modify, surrender, terminate, extend or renew, either orally or in writing, any Lease now existing or hereafter created upon the Property or any part thereof, or permit an assignment or sublease thereof without the prior written consent of Lender (to be granted or withheld in Lender's sole discretion).  Borrower shall not, without the prior written consent of Lender, assign or further encumber or convey or dispose (or permit or consent or agree to the conveyance, encumbrance or disposal) of any interest in the Property, and any assignment or encumbrance, or purported assignment or encumbrance, conveyance or disposal of any of the foregoing shall be void and of no effect for any purpose whatsoever.

**9.4.    Covenants, Conditions and Restrictions**.  Borrower shall not record any covenants, conditions, restrictions or declarations with respect to any portion of the Property, without the prior written consent of Lender. Lender may, in the exercise of its discretion, require that Borrower execute and deliver to Lender an assignment of the declarant's rights together with such other security agreements, financing statements and instruments as Lender may require which have the effect of creating a collateral assignment of Borrower's interest as declarant, all in a form acceptable to Lender.

**9.5.    Other Agreements Affecting the Property**. Borrower shall neither enter into any written agreement nor amend or modify, in any material respect, any REA or any other easements, covenants or conditions affecting all or any portion of the Property.

**9.6.    Management Agreement**.  Borrower shall not enter into any contract or agreement relating to the management of the Property (nor shall it permit any Borrower Party to enter into any such agreement) unless such contract or agreement (a) has been approved in writing by Lender, which approval shall not be unreasonably withheld or delayed, (b) can be terminated (for any reason) by Borrower or its successors or assigns (at no cost or expense) upon 30 days' written notice, and (c) if required by Lender in its discretion, is the subject of a fully executed and delivered Lender's form of Assignment and Subordination of Management Agreement.

**9.7.    Inspection of Books and Records**.  Borrower shall keep and maintain, at the Property or at Borrower's main office, proper and accurate books, records and accounts reflecting all items of income and expense incurred by Borrower in connection with the operation of the Property or in connection with any services, equipment or furnishings provided in the operation of the Property.    Borrower shall allow Lender and any of Lender's representatives, at any time during normal business hours, access to the records and books of account, including, without limitation, any supporting or related vouchers or papers kept at the Property or at Borrower's main office, by or on behalf of Borrower or any of its representatives in connection with the Property, such access to include the right to make abstracts or copies thereof.

Loan No. _____

**9.8.    Expenses.** Borrower shall, immediately upon demand, pay or reimburse Lender for all attorneys' fees and expenses incurred by Lender in any proceedings involving the estate of a decedent, an insolvent or a bankrupt, or in any action, proceeding or dispute of any kind in which Lender is made a party, or appears as an intervenor or party plaintiff or defendant, affecting or relating to this Agreement or any of the other Loan Documents, Borrower, or the Property, including, without limitation, the foreclosure of any of the Collateral Documents, any condemnation action involving any Property, or any action to protect Lender's interest in the Property, and any such amounts paid by Lender and not paid or reimbursed by Borrower as determined by Lender in its reasonable discretion, within 10 days after Lender's demand therefor shall be added to the indebtedness evidenced by the Note, secured by the lien of the Collateral Documents, and shall be due and payable upon demand. Borrower shall pay promptly to or as directed by Lender, after a request therefor by Lender, all internal expenses, charges, costs and fees relating to cost reviews and inspections of the Property and reviews of appraisals and environmental reports or materials related thereto, and all external expenses, charges, costs and fees, of or relating to the Loan, including, without limitation, all recording fees and charges, title insurance premiums, legal fees and expenses of outside counsel for Lender and any third-party engaged by Lender's outside counsel on behalf of Lender, appraisal fees, environmental consultant fees, insurance consultant fees, escrow fees and cost of surveys, and any such amounts paid by Lender and not paid or reimbursed by Borrower within 10 days after Lender's demand therefor shall be added to the indebtedness evidenced by the Note, as determined by Lender in its sole and absolute discretion, secured by the Collateral Documents, and shall be due and payable upon demand. In addition, Lender, in its sole and absolute discretion, shall not be obligated to fund any additional advances hereunder until Borrower has paid all amounts then due under this Section and, furthermore, hereby reserves the right to disburse to itself under the Loan, any or all of such amounts which are not received by Lender within said 10 day period.

**9.9.    Litigation.** During the term of the Loan, Borrower shall, upon receiving notice of same, promptly furnish Lender a written notice of any material litigation in which any Borrower Party is named as defendant or affecting or relating to the Property or a portion thereof, other than personal injury or workers compensation claims which are covered by insurance and minor construction contract disputes.

**9.10.    Appraisal.** Borrower acknowledges that Lender has the right to obtain a new Appraisal (or an update of an existing Appraisal) for the Property (or any portion thereof) at any time, but not more than once per year, while the Loan or any portion thereof remains outstanding either (i) when, in Lender's reasonable judgment, such an Appraisal is warranted as a result of Lender's internal evaluation of the Loan, or (ii) in order to comply with any statutes, rules, regulations or directives of governmental agencies having jurisdiction over Lender. Borrower agrees to pay, on demand by Lender, all expenses, charges, costs and fees of any such re-appraisal.

**9.11.    Capital Adequacy.** If Lender shall reasonably determine that the application or adoption of any law, rule, regulation, directive, interpretation, treaty or guideline regarding capital adequacy, or any change therein or in the interpretation or administration thereof, whether or not having the force of law (including, without limitation, application of changes to Regulation H and Regulation Y of the Federal Reserve Board issued by the Federal Reserve

Board on January 19, 1989 and regulations of the Comptroller of the Currency, Department of Treasury, 12 CFR Part 3, Appendix A, issued by the Comptroller of the Currency on January 27, 1989) increases the capital required or expected to be maintained by Lender or any person or entity controlling Lender, and such increase is based upon the existence of Lender's obligations hereunder and under other commitments of this type, then, within 10 days after demand from Lender, Borrower shall pay to Lender, from time to time, such amount or amounts as will compensate Lender or such controlling person or entity, as the case may be, for such increased capital requirement. The determination of any amount to be paid by Borrower under this Section shall take into consideration the policies of Lender or of any person or entity controlling Lender with respect to capital adequacy and shall be based upon any reasonable averaging, attribution and allocation methods. A certificate of Lender setting forth the amount or amounts as shall be necessary to compensate Lender as specified in this Section shall be delivered to Borrower and shall be conclusive in the absence of manifest error.

**9.12.** **Equity**. Borrower covenants, represents and warrants to Lender that it has made the contribution of Borrower's Funds described in **Section 3.2.2** and shall timely make each of the contributions of Borrower's Funds shown on the Project Cost Analysis in the full amount shown. Borrower shall furnish Lender, on a quarterly basis promptly after the end of each calendar quarter, an accounting showing all amounts paid by Borrower out of its own funds with respect to the Property.

**9.13.** **Equity Contributions; Balancing**. Borrower shall cause all contributions of Borrower's Funds required in the Project Cost Analysis to be made when required by the terms hereof. If requested by Lender, Borrower shall furnish Lender with evidence satisfactory to Lender of such required contributions of Borrower's Funds. Borrower agrees that it shall not be entitled to any reimbursement for or return on such contributions of Borrower's Funds and agrees that all such amounts shall remain as Borrower's equity contribution to the Project to complete said Improvements. It shall be Borrower's sole responsibility to keep the in balance and Borrower shall promptly notify Lender in writing if the cost to complete the Improvements and perform Borrower's other obligations hereunder at any time exceed, or appear likely to exceed, the contributions of Borrower's Funds remaining to be made by Borrower in accordance with the Project Cost Analysis. To the extent the proceeds of the Loan are insufficient or unavailable to complete the Improvements, Borrower agrees to make additional contributions of Borrower's Funds in amounts necessary to pay all costs and expenses for the construction of all Improvements which are part of the Project and the performance of Borrower's other undertakings hereunder when due, whether or not proceeds are available out of sales for such purpose. Borrower shall furnish Lender, on a quarterly basis promptly after the end of each calendar quarter, an accounting showing all amounts paid by Borrower out of its own funds with respect to the Loan. Without limitation of any other provision hereof, if (i) Lender at any time determines that, assuming the contributions of Borrower's Funds shown on the Project Cost Analysis will be timely made (provided, however, that Lender need not make that assumption unless Borrower has to that point made such contributions and paid all other costs and expenses of constructing the Project required hereunder when such costs and expenses are due and payable), the undisbursed portion of the Loan shall, for any reason, be less than the aggregate amount necessary, in Lender's sole judgment applying reasonable standards within the context of the local building industry, to pay for all work done and to be done and all other expenses for

Loan No. _____

completion of construction of the Improvements which are part of the Project, and to pay for all costs and expenses shown on the Project Cost Analysis or incidental to the Loan and for all of Borrower's undertakings hereunder, or (ii) Borrower fails to pay any of the amounts in the column labeled "Borrower's Equity" or "Borrower's Funds" on the Project Cost Analysis when required hereunder, then, as a further condition precedent to Lender's obligation to disburse any proceeds of the Loan, Borrower shall, within 15 days after written request by Lender, at Lender's option, deposit such deficiency in an account with Lender (the **"Project Account"**), which deposit shall first be exhausted before any further disbursement of the Loan shall be made, and as to which Project Account Borrower shall deliver such additional documentation as Lender (or, if appropriate, Lender's Affiliate) may request. Notwithstanding anything to the contrary herein, Lender shall have no obligation to disburse Loan proceeds once it has delivered such a request to Borrower until the requested Borrower's Funds are so deposited.

**9.14.    Signage**. Any sign(s) erected by Borrower in connection with the Project that identify any person or entity involved with the Project in any capacity other than or in addition to Borrower and/or Guarantor shall, at Lender's option and at no cost to Lender, also identify Lender as the source of financing.

**9.15.    No Lien Rights**. If any Borrower or any person or entity controlled by or affiliated with any of the foregoing acts as a general contractor, architect, engineer, subcontractor, property manager, supplier of materials, or otherwise performs lienable work or services with respect to any part of the Property, Borrower hereby irrevocably waives and relinquishes, or shall cause its Affiliate to waive and relinquish, as appropriate, any and all lien rights it may obtain as a result of such work or services.

**9.16.    Permits**. Before performing or allowing to be performed any work to which any Permit pertains, and before submitting any Application for Payment relating to funds to be used to pay for any of such work, Borrower shall have obtained such Permit.

**9.17.    Construction Schedule**. Borrower shall immediately notify Lender in writing in the event a material change or modification occurs in the Construction Schedule or in the event the pace of renovation, construction or installation of the Improvements materially varies from the Construction Schedule.  The Construction Schedule will not be modified, amended or supplemented without the prior written consent of Lender.

**9.18.    No Transfers or Other Financing**. Borrower shall not permit a Transfer of all or any portion of any direct or indirect ownership interest in Borrower.  In addition to the foregoing, Borrower shall not permit a Transfer of the Property (or any portion thereof or any direct or indirect interest therein), other than the encumbrance of such Property with the liens of the Loan Documents.  Other than any assignments or encumbrances evidenced by the Loan Documents, Borrower shall not, without the prior written consent of Lender, assign or further encumber or convey or dispose, or consent or agree, to the conveyance, encumbrance or disposal (except for sales contracts entered into in compliance with the provisions of this Agreement) of any other interest in the Property, and any assignment or encumbrance, or purported assignment or encumbrance, conveyance or disposal of any of the foregoing shall be void and of no effect for any purpose whatsoever.  Furthermore, Borrower shall not, without the prior written consent

Loan No. _____

of Lender, enter into any financing arrangement or loan transaction or consent to or agree to any such financing arrangement or loan transaction (except with respect to a time when this Loan as been repaid in full) other than the Loan, and any such financing arrangement or loan transaction shall be void and of no effect for any purpose whatsoever.

**9.19.   No Related Party Payments.**  No distributions or other payments shall be made directly or indirectly by Borrower or Owner to any person or entity or affiliate thereof owning a direct or indirect interest in Borrower or Owner.

**9.20.**   Omitted.

**10.   FINANCIAL STATEMENTS.**

**10.1.   Annual Reports.**  Within 90 days after the end of each fiscal year, beginning with the fiscal year which ends on December 31, 2006, Borrower shall deliver to Lender true and complete copies of balance sheets for Borrower and each Guarantor as of the last day of such fiscal year as well as a consolidated statement of cash flows detailing actual cash flows (and budgeted cash flows) for such fiscal year, and showing the percentage of occupancy, Net Operating Income and payroll expense. Each such annual report (the **"Annual Report"**) shall (i) be in a form substantially similar to the reports delivered to Lender prior to the date hereof, or such other form or forms reasonably satisfactory to Lender, (ii) be prepared in accordance with generally accepted accounting principles consistently applied and (iii) be audited by an accounting firm acceptable to Lender. Additionally, as part of each Annual Report, Borrower shall deliver to Lender a schedule of all material contingent liabilities and all other notes and schedules relating thereto, as well as a listing of the land and other property in which Borrower and each Guarantor has an interest and the nature of that interest. Borrower also shall deliver to Lender a copy of its federal income tax returns, promptly after filing them, and shall cause Guarantor to do the same as to Guarantor's federal income tax returns.

**10.2.   Property Annual Reports.**  In addition, 90 days after the end of each fiscal year, beginning with the end of the fiscal year of the date hereof, Borrower shall deliver to Lender true and complete copies of the unaudited, consolidated statement of cash flows detailing actual cash flows (and budgeted cash flows) for such fiscal year with respect to the Property. Each such annual report shall be in form reasonably satisfactory to Lender and certified by Borrower's chief financial officer.

**10.3.   Quarterly Reports.**  Within 45 days after the end of each fiscal year quarter, beginning with the fiscal quarter of the date hereof, Borrower shall deliver to Lender true and complete copies of the unaudited statements of cash flows for Borrower and each Guarantor detailing actual cash flows (and budgeted cash flows as well) for the period beginning January 1 of such fiscal year and ending on the last day of such quarter. Each such quarterly report shall be in form reasonably satisfactory to Lender and certified by Borrower's chief financial officer.

**10.4.   Operating Statements.**  Within 45 days after the end of each fiscal quarter, Borrower shall deliver to Lender true and complete copies of the monthly operating statements and rent roll for the Property. Each such operating statement and rent roll shall be in form reasonably satisfactory to Lender and certified by Borrower's chief financial officer.

**10.5.    Construction Liens.**  If a claim of a construction lien is recorded which affects the Property, Borrower shall, within twenty (20) days after Borrower becomes aware of such recording or service or within five (5) days of Lender's demand, whichever occurs first:  (a) pay and discharge the claim of lien; (b) effect the release thereof by recording or delivering to Lender a surety bond in sufficient form and amount; (c) cause the Title Company to insure over such claim of lien by endorsement to the Title Insurance Policy; or (d) provide Lender with other assurance which Lender deems, in its sole discretion, to be satisfactory for the payment of such claim of lien and for the full and continuous protection of Lender from the effect of such lien.

**10.6.    Inspections.**  Borrower shall permit, and shall cooperate with Lender in arranging for, inspections of the Property from time to time by any representatives of Lender.  In the event that such representative furnishes Lender with reports covering such inspections, Lender may, but is not under any obligation whatsoever to, furnish Borrower with copies of any of said reports.  Borrower acknowledges and agrees that (i) all of such inspections and reports shall be made for the sole benefit of Lender and not for the benefit of Borrower or any third party, and none of Lender, nor any of Lender's representatives assume any responsibility or liability (except to Lender) by reason of such inspections, reports or the furnishing of any of such reports to Borrower, (ii) Borrower shall not rely upon any of such inspections or reports for any purpose whatsoever, and (iii) such inspections and the furnishing of any of such reports to Borrower shall not constitute a waiver of any of the provisions of this Agreement or any of the obligations of Borrower hereunder.

**10.7.    Interest Rate Protection.**  In the event that Borrower enters into an Interest Rate Protection Agreement, concurrently therewith Borrower shall cause the Title Company to issue an amendment to the Title Insurance Policy increasing the insured amount by an amount reasonably calculated to be Borrower's maximum potential liability to Lender (as calculated by Lender) under such Interest Rate Protection Agreement.

**10.8.    Construction.**  Except as expressly permitted under this Agreement or the Mortgage, Borrower shall not perform any construction or other improvement or repair to the Property except with the prior written consent of Lender, to be granted or withheld by Lender in its sole discretion.

**10.9.    Other Information.**  Borrower shall furnish, but not more than once each year, within 10 days after written request from Lender, a written statement, duly acknowledged, setting forth the unpaid principal of, and interest on, the indebtedness secured by each Mortgage and whether or not any offsets or defenses exist against such principal and interest.  In addition, Borrower shall deliver to Lender whatever additional information concerning any Property, or any Borrower Party which Lender may reasonably request.

## 11.    BORROWER'S DEFAULT.

### 11.1.    Borrower's Defaults and Lender's Remedies.

**11.1.1.    Events of Default.**  Each of the following shall constitute an "**Event of Default**" under this Agreement:

Loan No. _____

**11.1.1.1.**     Borrower fails to pay, when due, any principal of or installment of interest on the Note, subject to the provisions of this Agreement, or fails to contribute or deposit any Borrower's Funds as and when required under this Agreement; or

**11.1.1.2.**     Borrower fails to pay, when due, any part of the Loan Fee, the Additional Loan Fee or any other amount payable under this Agreement (other than principal or interest) including, without limitation, to reimburse Lender for or to pay expenses incurred by the Lender upon Lender's demand, and such failure continues for a period of five Business Days after notice thereof from Lender to Borrower; or

**11.1.1.3.**     Borrower fails to keep or perform any of its agreements, undertakings, obligations, covenants or conditions under this Agreement not expressly referred to in another clause of this Section and (A) such failure continues for a period of 30 days after notice thereof from Lender to Borrower, or (B) if such failure cannot, because of its nature, be cured within said 30-day period, then, if Borrower commences curing such failure within said 30-day period and diligently continues such cure, such failure continues for an additional 60-day period after an additional notice; or

**11.1.1.4.**     Any default or **"Event of Default"** occurs, as defined under any of the Loan Documents; or

**11.1.1.5.**     Any Borrower Party fails to keep or perform any of its agreements, undertakings, obligations, covenants or conditions under the Loan Documents or Other Related Documents to which it is a party, and such failure continues beyond any applicable cure period; or

**11.1.1.6.**     Any representation, warranty or certification made in this Agreement by Borrower or otherwise made in writing in connection with or as contemplated by this Agreement or any of the other Loan Documents by Borrower or any Borrower Party shall be or become materially incorrect or false, or any material representation to Lender by Borrower as to the financial condition or credit standing of any Borrower Party is or proves to be false or misleading; or

**11.1.1.7.**     There is any material deviation in the work of construction from the Plans and Specifications or governmental requirements or the appearance or use of defective workmanship or materials in constructing the Improvements, and Borrower fails to remedy the same to Lender's reasonable satisfaction within 30 days of Lender's written demand to do so; or the sale or leasing of any of the Improvements in accordance with the Loan Documents is prohibited, enjoined or delayed for a continuous period of more than 30 days; or utilities or other public services necessary for the full occupancy and utilization of the Property and Improvements are curtailed for a continuous period of more than 30 days; or

**11.1.1.8.**     The recording of any claim of lien against the Property or the Improvements and the continuance of such claim of lien for 30 days without discharge, satisfaction or provision for payment being made by Borrower in a manner satisfactory to Lender; or the condemnation, seizure or appropriation of, or occurrence of an uninsured casualty with respect to any material portion of the Property or the Improvements; or the sequestration or

Loan No. _____

attachment of, or any levy or execution upon any Property or the Improvements, any other Collateral, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of 30 days or the sale of the assets affected thereby; or

11.1.1.9.    The filing of a petition by any Borrower Party for relief under the Bankruptcy Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law; the filing of any pleading or an answer by any Borrower Party in any involuntary proceeding under the Bankruptcy Code or other debtor relief law which admits the jurisdiction of the court or the petition's material allegations regarding any Borrower Party's insolvency; a general assignment by any Borrower Party for the benefit of creditors; or any Borrower Party applying for, or the appointment of, a receiver, trustee, custodian or liquidator of any Borrower Party or any of its property; or

11.1.1.10.    The failure of any Borrower Party to effect a full dismissal of any involuntary petition under the Bankruptcy Code or any other debtor relief law that is filed against any Borrower Party or in any way restrains or limits any Borrower Party or Lender regarding the Loan, the Property or the Improvements, prior to the earlier of the entry of any court order granting relief sought in such involuntary petition, or 60 days after the date of filing of such involuntary petition; or

11.1.1.11.    The dissolution of or the occurrence of any material management or organizational change in Borrower which Lender determines, in its sole and absolute discretion, shall have a material adverse effect on the Loan, any Property and the Improvements, or on the ability of any Borrower Party to perform its respective obligations under the Loan Documents; or

11.1.1.12.    Except in compliance with **Sections 2.9** and **2.10** hereof with respect to the release of an entire Property, the Property or any part thereof or any interest therein is sold, conveyed, refinanced, transferred, leased, assigned, exchanged, disposed of, or is further encumbered, or an agreement for any of the foregoing is entered into, without the prior written consent of Lender; or

11.1.1.13.    Any Borrower Party enters into any secondary or additional financing agreements or arrangements of any kind whatsoever secured, in whole or in part, by all or any part of or interest in any Collateral; or

11.1.1.14.    There occurs, in the reasonable opinion of Lender, a material adverse change in the financial condition of Borrower or Guarantor; or

11.1.1.15.    Any order or decree is entered by any court of competent jurisdiction directly or indirectly enjoining or prohibiting Lender or any Borrower Party from performing any of their obligations under this Agreement or any of the Loan Documents and such order or decree is not vacated, and the proceedings out of which such order or decree arose are not dismissed, within 60 days after the granting of such decree or order; or

Loan No. _____

**11.1.1.16.**    The filing of formal charges by any governmental or quasi-governmental entity, including, without limitation, the issuance of an indictment, under a RICO Related Law against any Borrower Party or any Manager; or

**11.1.1.17.**    Final judgment or judgments for the payment of money aggregating in excess of $100,000.00 is or are outstanding against Borrower or against any of its property or assets, and any one of such judgments has remained unpaid, unvacated, unbonded or unstayed by appeal or otherwise for a period of 45 days from the date of its entry; or

**11.1.1.18.**    The Property is rezoned (except for such rezoning as does not affect the value, use or operation of the Property), either voluntarily or involuntarily, or any agreement for the foregoing is entered into, without the prior written consent of Lender; or

**11.1.1.19.**    Borrower fails to commence compliance with or to cause commencement of compliance with (or to bond or indemnify Lender to its satisfaction with regard to) any requirement (including, without limitation, compliance with all applicable zoning, building, health, fire and environmental laws, rules, regulations and ordinances) of any governmental authority having jurisdiction within 15 days after Borrower has notice of such requirement or Borrower fails to diligently prosecute such compliance; or

**11.1.1.20.**    Any order or decree is entered by any court of competent jurisdiction directly or indirectly enjoining the operation of any Property or prohibiting Lender or Borrower from performing any of their obligations under any of the Loan Documents and such order or decree is not vacated, and the proceedings out of which such order or decree arose are not dismissed, within 30 days after the granting of such decree or order; or

**11.1.1.21.**    Borrower fails to comply, in all respects, with any Letter of Credit Collateral Request within three business days after Lender makes a Letter of Credit Collateral Request. **[LC]**

**11.1.1.22.**    Any of the post-closing requirements, if any are referenced in this Agreement, have not been satisfied, as determined by Lender in its sole and absolute discretion, by the date that is five business days after the date hereof (or such other amount of time as is set forth in the post-closing requirements).

**11.1.2.**    **Lender's Remedies**.  Upon the happening of any Event of Default, Lender shall have the right, if such Event of Default shall then be continuing, in addition to all the remedies conferred upon Lender by law or equity or the terms of any Loan Document, to do any or all of the following, concurrently or successively, without notice to any Borrower Party:

**11.1.2.1.**    Declare the Note to be, and it shall thereupon become, immediately due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, anything contained herein or in the Note to the contrary notwithstanding; and/or

Loan No. _____

           **11.1.2.2.**      Charge interest on the outstanding balance of the Note at the Default Rate, subject to the provisions hereof; and/or

           **11.1.2.3.**      Terminate Lender's obligations under this Agreement, if any, to extend credit of any kind or to make any disbursement, whereupon the commitment and obligation of Lender to extend credit or to make disbursements hereunder shall terminate; and/or

           **11.1.2.4.**      Exercise all of its rights and remedies at law, in equity and/or pursuant to any or all Collateral Documents, including foreclosing on the Collateral.

           Borrower shall pay to Lender, upon demand, all expenses (including, without limitation, attorneys' fees and expenses) of obtaining such judgment or decree or of otherwise seeking to enforce its rights under this Agreement or any of the other Loan Documents; and all such expenses, as determined by Lender in its sole and absolute discretion, shall, until paid, be secured by the Loan Documents and shall bear interest at the Default Rate described in the Note.

      **11.2.**   **Protective Advances**.  If an Event of Default occurs, Lender may (but shall in no event be required to) cure any such Event of Default and any amounts expended by Lender in so doing, as determined by Lender in its sole and absolute discretion, shall (i) be deemed advanced by Lender under an obligation to do so regardless of the identity of the person or persons to whom such funds are furnished, (ii) constitute additional advances hereunder, the payment of which is additional indebtedness evidenced by the Note, and (iii) become due and owing, at Lender's demand, with interest accruing from the date of disbursement thereof until fully paid at the Default Rate.

      **11.3.**   **Other Remedies**.  If any Event of Default shall occur and be continuing, Lender may, in addition to any other rights and remedies hereunder, exercise any and all remedies provided in any of the other Loan Documents.

      **11.4.**   **RICO Related Law Concerns**.  Notwithstanding anything to the contrary contained in this Agreement, if Lender has reasonable cause to believe that any material portion of any Property or of any collateral securing the Loan or of any other funds, property or other assets of Borrower might be subject to forfeiture under any RICO Related Law, Lender may, in its sole and absolute discretion, refuse to make any further disbursements, hereunder or under any of the other Loan Documents, of any kind whatsoever until Lender has no reasonable belief that any portion of any Property or any of such assets are subject to forfeiture under any RICO Related Law.

      **11.5.**   **Completion by Lender**.  Borrower agrees to develop, construct and complete all of the Improvements in all material respects pursuant to the Plans and Specifications and the Site Plan and to the satisfaction of the Municipality and all other governmental agencies and authorities having jurisdiction thereof.  Without limiting the generality of any of the foregoing, if Borrower is not constructing the Improvements or does not complete the Improvements as required above, Lender shall have the option at any time to so complete the Improvements.  If Lender elects to do so, Borrower promises to pay to Lender, in addition to any other amounts which may be owing under any of the Loan Documents, all sums expended by Lender to

Loan No. _____

complete the Improvements, and such amounts owing to Lender shall be payable on demand and shall bear interest at the Default Rate provided in the Note. In addition, if Lender shall advance any funds or honor any Letter of Credit which it may have issued, on behalf of Borrower, to any governmental authority to assure completion of the Improvements, Borrower shall pay all amounts advanced under the Note or under such Letter of Credit, together with interest on such amount, with respect to an advance under the Note, at the applicable Note Rate. The obligations of Borrower pursuant to this Section are continuing obligations of the Borrower notwithstanding that Borrower may have paid the Note in full at the time such obligations may arise.

**11.6.   No Lender Liability.**   To the extent permitted by law, Lender shall have no liability for any loss, damage, injury, cost or expense resulting from any action or omission by it, or any of its representatives, which was taken, omitted or made in good faith.

**11.7.   Lender's Fees and Expenses.**   In case of any Event of Default hereunder, Borrower shall pay Lender's fees and expenses including, without limitation, attorneys' fees and expenses, in connection with the enforcement of this Agreement or any of the other Loan Documents.

## 12.   MISCELLANEOUS.

**12.1.   Indemnification.**   Borrower shall indemnify, defend and hold Lender and its Affiliates harmless from and against any and all losses, liabilities, obligations, penalties, claims, fines, demands, litigation, defenses, costs, judgments, suits, proceedings, actual damages, disbursements or expenses of any kind or nature whatsoever (including, without limitation, attorneys' fees and expenses) which may at any time be either directly or indirectly imposed upon, incurred by or asserted or awarded against Lender or any of Lender's Affiliates in connection with, arising from or relating to Lender's entering into or carrying out the terms of this Agreement or being the holder of the Note, or the use, operation or maintenance of the Property, including, without limitation, any injury or damage to person or property, or both, occurring on or about the Property, other than any loss, liability, damage, suit, claim, expense, fees or costs arising solely by reason of Lender's or any of Lender's Affiliates' willful misconduct or gross negligence.

**12.2.   Assignment and Participation.**   Lender may pledge or otherwise hypothecate all or any portion of this Agreement or grant participations herein (provided Lender acts as agent for any participants, except as provided below), or in any of its rights and security hereunder, including, without limitation, the Note. Lender may also assign all or any part of the Loan and the Lender's obligations in connection therewith to one or more commercial banks or other financial institutions or investors (each an "**Assignee Lender**"). Lender shall notify Borrower in advance of the identity of any proposed Assignee Lender. Upon delivery to Borrower of an executed copy of the Assignee Lender's assignment and acceptance (i) each such Assignee Lender shall be deemed to be a party hereto and, to the extent that rights and obligations hereunder have been assigned and delegated to such Assignee Lender, such Assignee Lender shall have the rights and obligations of Lender hereunder and under the other Loan Documents (ii) Lender, to the extent that rights and obligations hereunder have been assigned and delegated by it, shall be released from its obligations hereunder and under the other Loan Documents

(including, without limitation, the obligation to fund the Assignee Lender's share of the Loan). Within five Business Days after receipt of a copy of the executed assignment and acceptance document, Borrower shall execute and deliver to Lender a new Note or Notes, as applicable (for delivery to the relevant Assignee Lender), evidencing such Assignee Lender's assigned portion of the Loan and a replacement Note or Notes, as applicable, in the principal amount of the Loan retained by Lender (such Note to be in exchange for, but not in payment of, the Note then held by Lender). Such Note shall be dated the date of the predecessor Note. Lender shall mark the predecessor Note "exchanged" and deliver it to Borrower. Accrued interest on that part of the predecessor Note evidenced by the new Note, and accrued fees, shall be paid as provided in the assignment agreement between Lender and to the Assignee Lender. Accrued interest on that part of the predecessor Note evidenced by the replacement Note shall be paid to Lender. Accrued interest and accrued fees shall be so apportioned between the Note and paid at the same time or times provided in the predecessor Note and in this Agreement. Borrower authorizes Lender to disclose to any prospective Assignee Lender any financial or other information pertaining to Borrower, the Loan, the Property or Improvements. In addition, Borrower agrees that, if so requested by Lender, Borrower will cause all insurance policies, binders and commitments (including, without limitation, casualty insurance and title insurance) required by the Loan Documents to be delivered to Lender to name the Assignee Lender as an additional insured or obligee, as Lender may request. Anything in this Agreement to the contrary notwithstanding, and without the need to comply with any of the formal or procedural requirements of this Agreement, including this **Section 12.2**, Lender may at any time and from time to time pledge and assign all or any portion of its rights under all or any of the Loan Documents to a Federal Reserve Bank; provided that no such pledge or assignment shall release Lender from its obligations thereunder.

     **12.3.  Prohibition on Assignment.** Borrower shall not assign or attempt to assign its rights under this Agreement, either voluntarily or by operation of law.

     **12.4.  Time of the Essence.** Time is of the essence of this Agreement.

     **12.5.  No Waiver.** No waiver of any term, provision, condition, covenant or agreement herein contained shall be effective unless set forth in a writing signed by Lender, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising, by Lender or any holder of the Note, of any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof, or the exercise of any other right or remedy provided by law. The rights and remedies provided in this Agreement are cumulative and not exclusive of any right or remedy provided by law or equity. No notice or demand on Borrower in any case shall, in itself, entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, expressed or implied, by Lender to or of any breach or default by Borrower in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Borrower hereunder. Failure on the part of Lender to complain of any acts or failure to act or to declare an Event of Default, irrespective of how long such failure continues, shall not constitute a waiver by

Loan No. _____

Lender of its rights hereunder or impair any rights, powers or remedies on account of any breach or default by Borrower.

**12.6.** **Severability.** Any provision of this Agreement which is unenforceable or invalid or contrary to law, or the inclusion of which would adversely affect the validity, legality or enforcement of this Agreement, shall be of no effect and, in such case, all the remaining terms and provisions of this Agreement shall subsist and be fully effective according to the tenor of this Agreement the same as though any such invalid portion had never been included herein. Notwithstanding any of the foregoing to the contrary, if any provisions of this Agreement or the application thereof are held invalid or unenforceable only as to particular persons or situations, the remainder of this Agreement, and the application of such provision to persons or situations other than those to which it shall have been held invalid or unenforceable, shall not be affected thereby, but shall continue valid and enforceable to the fullest extent permitted by law.

**12.7.** **Interest.** All agreements between Borrower and Lender (including, without limitation, this Agreement and any other Loan Documents) are expressly limited so that in no event whatsoever shall the amount paid or agreed to be paid to Lender exceed the lesser of: (i) the Interest Rate Cap; or (ii) the highest lawful rate of interest permissible under the laws of the State of Illinois. If, from any circumstances whatsoever, fulfillment of any provision hereof or of any other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then ipso facto, the obligation to be fulfilled shall be reduced to the highest lawful rate of interest permissible under the laws of the State of Illinois, and if for any reason whatsoever, Lender shall ever receive as interest an amount which would be deemed unlawful, such interest shall be applied to the payment of the last maturing installment or installments of the indebtedness secured by the Collateral (whether or not then due and payable) and not to the payment of interest.

**12.8.** **Notices.** Any notice which either party hereto may be required or may desire to give hereunder shall be deemed to have been given if in writing and if delivered personally, or if mailed, postage prepaid, by United States registered or certified mail, return receipt requested, or if delivered by a responsible overnight courier, addressed:

| | |
|---|---|
| if to Borrower: | Flamingo West, LLC<br>3900 SW 30 Avenue, Suite Three<br>Fort Lauderdale, FL 33312 |
| with an additional copy to: | Elizabeth Brandon-Brown, Esq.<br>9045 LaFontana Blvd., Suite 101<br>Boca Raton, FL 33434 |
| in the case of Lender to: | First Bank and Trust Company of Illinois<br>300 East Northwest Highway<br>Palatine, Illinois 60067<br>Attn: C. Richard Schuler |
| and a copy to: | Cobb & Ebin P.A. |

Loan No. ____

825 Brickell Bay Drive, Suite 1648
Miami, FL 33131
Attn: Thomas C. Cobb, Esq.

or to such other address or addresses as the party to be given notice may have furnished in writing to the party seeking or desiring to give notice, as a place for the giving of notice, provided that no change in address shall be effective until seven days after being given to the other party in the manner provided for above. Any notice given in accordance with the foregoing shall be deemed given when delivered personally or, if mailed, five Business Days after it shall have been deposited in the United States mails as aforesaid or, if sent by overnight courier, the Business Day following the date of delivery to such courier.

**12.9.** **Successors and Assigns.** This Agreement shall inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns except that, unless Lender consents in writing, no assignment made by Borrower in violation of this Agreement shall confer any rights on any assignee of Borrower.

**12.10.** **No Joint Venture.** Nothing contained herein or in any document executed pursuant hereto and no action or inaction whatsoever on the part of Lender, shall be deemed to make Lender a partner or joint venturer with Borrower.

**12.11.** **Brokerage Commissions.** Borrower shall indemnify, defend and hold Lender and its Affiliates harmless from and against any and all losses, liabilities, obligations, penalties, claims, fines, lost profits, demands, litigation, defenses, costs, judgments, suits, proceedings, damages, disbursements or expenses of any kind or nature whatsoever (including, without limitation, attorneys' fees and expenses), consequential or otherwise, which may at any time be either directly or indirectly imposed upon, incurred by or asserted or awarded against Lender or any of its Affiliates in connection with, arising out of or relating to any claim of a broker's or finder's fee against Lender or any person or entity in connection with the transaction herein contemplated arising out of or relating to Borrower's or Lender's action or inaction.

**12.12.** **Publicity.** Borrower shall not publicize this Loan without the prior written consent of Lender.

**12.13.** **Documentation.** All documents and other matters required by any of the provisions of this Agreement to be submitted or furnished to Lender shall be in form and substance satisfactory to Lender.

**12.14.** **Additional Assurances.** Borrower agrees that, at any time or from time to time, upon the written request of Lender, it will execute all such further documents and do all such other acts and things as Lender may reasonably request to effectuate the transaction herein contemplated.

**12.15.** **Entire Agreement.** This Agreement and the Exhibits hereto constitute the entire agreement between the parties hereto with respect to the subject matter hereof and may not be

Loan No. _____

modified or amended in any manner other than by supplemental written agreement executed by the parties hereto.

**12.16.  Choice of Law**.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois.  Nothing herein shall be deemed to limit any rights, powers or privileges which Lender may have pursuant to any law of the United States of America or any rule, regulation or order of any department or agency thereof and nothing herein shall be deemed to make unlawful any transaction or conduct by Lender which is lawful pursuant to, or which is permitted by, any of the foregoing.

**12.17.  No Third Party Beneficiary**.  This Agreement is made for the sole benefit of Borrower and Lender, and no other person shall be deemed to have any privity of contract hereunder nor any right to rely hereon to any extent or for any purpose whatsoever, nor shall any other person have any right of action of any kind hereon or be deemed to be a third party beneficiary hereunder.

**12.18.  Legal Tender of United States**.  All payments hereunder shall be made in coin or currency which at the time of payment is legal tender in the United States of America for public and private debts.

**12.19.  Definitions; Captions**.  With respect to any reference in this Agreement to any defined term, (i) if such defined term refers to a person, or a trust, corporation, partnership or other entity, then it shall also mean all heirs, legal representatives, successors and assigns of such person or entity, and (ii) if such defined term refers to a document, instrument or agreement, then it shall also include any replacement, extension or other modification thereof.  Captions contained in this Agreement in no way define, limit or extend the scope or intent of their respective provisions.

**12.20.  Acknowledgments**.  Borrower acknowledges that Lender charges fees for services it provides in connection with administering its loans including but not limited to, release fees, construction draw fees and inspection fees.  These may or may not differ substantially from fees charged by other institutions.  Borrower hereby acknowledges receipt of the Lender's current Commercial Real Estate Loan Fee Schedule for certain services, a copy of which is attached hereto as **Exhibit D**.  Borrower agrees to pay Lender's fees pursuant to such Schedule and authorizes the Lender to charge said fees directly to the loan balance at the sole and absolute discretion of the Lender.  Borrower acknowledges and agrees that certain costs and expenses advanced by Lender and charged to Borrower (including, but not limited to, appraisal fees, attorney's fees, title fees and environmental inspection report fees) may include not only Lender's actual out-of-pocket costs but additionally a "mark-up" by Lender.  Borrower acknowledges and agrees that said "mark-up" will be an amount determined by Lender, in its sole discretion, which may, but does not need to be, deemed reasonable and/or customary to others, and will represent compensation for Lender's oversight, review and analysis as well as a profit for Lender for providing these services.  Borrower agrees to pay Lender's charges for such services rendered by it or others and authorizes Lender to charge said fees directly to the loan balance at the discretion of Lender.

Loan No. _____

**12.21.** **Interpretation**.   All references herein to a party's best knowledge shall be deemed to mean the best knowledge of such party based on commercially reasonable inquiry. All references herein to Borrower's knowledge shall be deemed to refer to the knowledge of each Borrower Party.  Unless specified to the contrary herein, all references herein to an exercise of discretion or judgment by Lender, to the making of a determination or designation by Lender, to the application of Lender's discretion or opinion, to the granting or withholding of Lender's consent or approval, to the consideration of whether a matter or thing is satisfactory or acceptable to Lender, or otherwise involving the decision making of Lender, shall be deemed to mean that Lender shall decide unilaterally using its sole and absolute discretion or judgment. The terms "**herein**," "**hereof**," "**hereunder**" and any other similar terms used herein shall be deemed to refer to this Agreement in its entirety.  Any reference contained herein to attorneys' fees and expenses shall be deemed to be reasonable fees and expenses of Lender's outside counsel and of any other third-party experts or consultants engaged by Lender's outside counsel on Lender's behalf.  All references to any Loan Document shall be deemed to be to such document as amended, modified or restated from time to time.

**12.22.** **WAIVER OF RIGHT TO JURY TRIAL**.   BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN ANY WAY IN CONNECTION WITH THIS AGREEMENT, THE NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY OTHER STATEMENTS OR ACTIONS OF BORROWER OR LENDER.  BORROWER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS DISCUSSED THIS WAIVER WITH SUCH LEGAL COUNSEL.  BORROWER FURTHER ACKNOWLEDGES THAT (i) IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER, (ii) THIS WAIVER HAS BEEN REVIEWED BY BORROWER AND BORROWER'S COUNSEL AND IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THE AGREEMENT AND THE OTHER LOAN DOCUMENTS (iii) THIS WAIVER SHALL BE EFFECTIVE AS TO EACH OF SUCH OTHER LOAN DOCUMENTS AS IF FULLY INCORPORATED THEREIN.

**12.23.** **CREDIT REPORTING**.   BORROWER IS HEREBY NOTIFIED THAT LENDER MAY REPORT INFORMATION ABOUT THE LOAN ACCOUNT TO CREDIT BUREAUS.  FURTHERMORE, LATE PAYMENTS, MISSED PAYMENTS, OR OTHER DEFAULTS ON THE LOAN ACCOUNT MAY BE REFLECTED IN BORROWER'S CREDIT REPORT.  BY SIGNATURE BELOW, BORROWER ACKNOWLEDGES RECEIPT OF THIS NOTICE.

**[THE REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Loan No. _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**BORROWER:**

FLAMINGO WEST, LLC, a Florida limited liability company

By: _____
Michael Annecca
Managing Member

By: _____
Kenneth E. Richardson
Managing Member

**LENDER:**

FIRST BANK AND TRUST COMPANY OF ILLINOIS, an Illinois state bank

By: _____
:   Print Name: _C. Richard Schuler_
    Print Title: _President + CEO_

Loan No. _____

**EXHIBIT A**

**LOAN DOCUMENTS**

<u>Loan Documents</u>.  The documents listed below, which are either defined in this Agreement or below, and amendments, modifications and supplements thereto which have received the prior written consent of Lender and Borrower, together with any documents executed in the future that are approved by Lender and Borrower and that recite that they are **"Loan Documents"** for purposes of this Agreement are collectively referred to herein as the Loan Documents:

1. Loan Agreement
2. Promissory Note
3. Mortgage
4. Guaranty of Payment and Performance
5. Completion Guaranty
6. UCC-1 Financing Statement – State
7. UCC-1 Financing Statement – Local
8. Hazardous Materials Indemnity Agreement
9. Assignment of Contracts, Permits and Licenses
10. Assignment of Purchase Contracts and Deposits
11. Assignment of Leasing Contract
12. Loan Closing Statement
13. Such other instruments and documents as Lender may reasonably request.

Loan No. _____

**EXHIBIT B**

## Project Cost Analysis

| | Cost | % | $/Unit | $/SF |
|---|---|---|---|---|
| Hard Construction Costs | | | | |
| Total Hard Construction Costs | $ 6,447,200 | 62.06% | $ 586,109 | $ 260.39 |
| Soft Costs | | | | |
| Architectural & Engineering | $ 270,000 | | $ 24,545 | |
| Insurance & Legal | $ 60,000 | | $ 5,455 | |
| Advertising & Marketing | $ 175,000 | | $ 15,909 | |
| Impact Fees | $ 25,000 | | $ 2,273 | |
| Permit Fees | $ 70,000 | | $ 6,364 | |
| Print Reproduction | $ 10,000 | | $ 909 | |
| Studies & Tests | $ 20,000 | | $ 1,818 | |
| Appraisal Fee | $ 5,000 | | $ 455 | |
| General & Administration | $ 250,000 | | $ 22,727 | |
| Closing Costs | $ 75,000 | | $ 6,818 | |
| Commissions | $ 285,230 | | $ 25,930 | |
| Total Soft Construction Costs | $ 1,245,231 | 11.99% | $113,203 | $50.29 |
| Carry | | | | |
| Taxes & Insurance | $ 67,000 | | $ 6,091 | |
| Interest Reserve | $ 828,729 | | $ 81,430 | |
| Total Carry Costs | $ 895,729 | 8.62% | $ 87,521 | $36.18 |
| Land | | | | |
| At Original Cost | $ 1,800,000 | 17.33% | $ 163,636 | $72.70 |
| **Total Development Costs** | **$ 10,388,160** | **100.0%** | **$ 944,378** | **$419.55** |

Loan No. _____

**EXHIBIT C**

**RELEASE PAYMENT**

The Release Payment applicable to each Unit shall be the greater of (i) 100% of net sales proceeds of that Unit (i.e., gross sales price minus the closing costs and commissions for that Unit, not to exceed 5% of the gross sales price); or (ii) the Minimum Release Price for that Unit, which shall be $450.00 per square foot of area for that Unit, is set forth in the following table:

| Unit Number | Square Feet |
|---|---|
| 1 | 2,053.00 |
| 2 | 2,190.00 |
| 3 | 1,995.00 |
| 4 | 2,108.00 |
| 5 | 2,053.00 |
| 6 | 2,190.00 |
| 7 | 1,995.00 |
| 8 | 2,108.00 |
| 9 | 2,053.00 |
| 10 | 2,190.00 |
| 11 | 3,825.00 |
| **Totals** | **24,760.00** |

Loan No. _____

**EXHIBIT D**

# First Bank/Illinois

## COMMON COMMERCIAL REAL ESTATE LOAN FEES

This is a partial listing of commonly incurred fees and is not intended to be a complete listing.  Trust fees are not included.

| | |
|---|---|
| INSURANCE REVIEW: | $750.00 |
| FLOOD ZONE CERTIFICATION: | $40.00 |
| DOCUMENTATION FEE (in-house closings and modifications): | $1,500.00 |
| PAYOFF LETTER RESEARCH AND PREP.: | $200.00 |
| RELEASES:<br>    FULL & PARTIAL: | $250.00 |
| CONSTRUCTION LOAN DRAW REQUESTS:<br>    PROJECTS UNDER $2,000,000 OF VALUE: | $250.00 |
|     PROJECTS $2,000,000 OF VALUE AND OVER: | $500.00 |
| OVERNIGHT COURIER: | $25.00 |
| MESSENGER—CHICAGO AREA: | $75.00 |
| **12.24.** COLLATERAL INSPECTION BY BANK PERSONNEL | $1,500.00, plus costs |

All other expenses incurred by the Bank will be passed on to the borrower.

**effective 12/04—subject to change without notice**

I:\TCC\FirstBank&TrustCo\FlamingoWest\LoanAgreement-004.doc

D-1

08CV4987
JUDGE NORDBERG
MAGISTRATE JUDGE ASHMAN
EDA

# EXHIBIT 3



Loan No. ____

2.4

## GUARANTY OF PAYMENT AND PERFORMANCE

**THIS GUARANTY OF PAYMENT AND PERFORMANCE** (this "**Guaranty**") is executed and delivered this __ day of October, 2006 by **KENNETH E. RICHARDSON** and **MICHAEL ANNECCA**, each as individuals ("**Guarantors**"). All capitalized terms used but not defined herein shall have the same meaning as given to such term in the Loan Agreement (as defined below).

### 1.   THE GUARANTY.

**1.1.   Guarantors' Agreement**. Each of the Guarantors hereby jointly and severally, unconditionally and irrevocably guarantees to FIRST BANK AND TRUST COMPANY OF ILLINOIS ("**Lender**") to pay and perform when due the Obligations (as hereinafter defined) and to pay on demand the Expenses (as hereinafter defined). This Guaranty is absolute, independent and continuing under all circumstances, and is a guaranty of payment and performance, not of collection. Each Guarantor hereby acknowledges that Lender has given sufficient consideration for this Guaranty by entering into that certain Loan Agreement (Senior Loan) dated of even date herewith (the "**Loan Agreement**") with FLAMINGO WEST, LLC, a Florida limited liability company ("**Borrower**"), and agreeing to make the loan described therein (the "**Loan**") and to otherwise perform its obligations thereunder. Each Guarantor hereby further acknowledges that Lender is doing all of the foregoing in reliance on each of the terms of this Guaranty.

**1.2.   Obligations**. For all purposes of this Guaranty, the term "**Obligations**" shall mean all monetary obligations of Borrower to Lender of any kind whatsoever, howsoever created, arising or evidenced, whether pursuant to a covenant, representation, warranty, indemnity or other agreement of any kind, whether direct or indirect, absolute or contingent, recourse or non-recourse, or now or hereafter existing, or due or to become due, and which arise under the Loan Agreement, the Note (as defined in the Loan Agreement) or any other Loan Document (as defined in the Loan Agreement), including, without limitation, the obligation to pay the principal amount of each of the Note when due thereunder and the obligation to pay interest under each of the Note, including any interest at the post-maturity or default rate (the "**Default Rate**"), any environmental obligations, including any indemnity with respect to environmental matters (whether or not such obligations survive payment in full of the Note).

**1.3.   Expenses**. For all purposes of this Guaranty, the term "**Expenses**" shall mean all attorneys' fees and expenses and all other costs and expenses of any kind which Lender may at any time pay or incur after an Event of Default under the Loan Agreement in attempting to collect, compromise or enforce in any respect the Obligations or this Guaranty, whether or not suit is ever filed, and whether or not in connection with any insolvency, bankruptcy, reorganization, arrangement or other similar proceeding involving Borrower or any Guarantor. If Lender pays any such cost or expense, "Expenses" shall also include interest at the Default Rate on any such payment from the date thereof until repayment of Lender in full.

Loan No. _____

**1.4.    Total Amount of the Obligations.** Each Guarantor acknowledges that the total amount of the Obligations may exceed the total amount necessary to pay in full each of the Note and all of the Expenses.

**1.5.    Setoff and Grant of Security.** Each Guarantor hereby consents to Lender's exercise of the right, without demand or notice, to appropriate and apply to any amounts due under this Guaranty any and all balances, credits, deposits (general or special, time or demand, provisional or final), accounts or monies of Each Guarantor with Lender. In addition, each Guarantor grants to Lender to secure its obligations hereunder a security interest in all property of any kind owned by such Guarantor now or hereafter for any reason in the possession or control of, or in transit to, Lender or any agent or bailee for Lender ("**Guaranty Collateral**"). Lender shall have the right to sell or otherwise dispose of any of the Guaranty Collateral, and shall have all rights and remedies with respect to the Guaranty Collateral of a secured party under the Uniform Commercial Code. Lender's rights under this Section shall be in addition to all rights of setoff and all other rights to a lien or security interest which Lender may have under applicable law.

**1.6.    Continuing Guaranty.** This Guaranty shall in all respects be a continuing guaranty, remaining in full force and effect (notwithstanding, without limitation, that from time to time all Obligations may have been satisfied in full) until all of the following have occurred: (i) all of the Obligations have been satisfied in full, (ii) all of the obligations of each of the Guarantors hereunder have been satisfied in full, and (iii) Lender has no further obligation to make any advance under the Loan Agreement. No notice of discontinuance or revocation shall affect any of the obligations of any Guarantor hereunder or of Borrower or any other obligor under any of the Obligations. Lender shall not be obligated to accept at any time any deed in lieu of foreclosure, and all obligations of each Guarantor hereunder shall survive foreclosure or any deed in lieu of foreclosure which Lender may accept, to the extent any of the Obligations remain unsatisfied or otherwise survive.

**1.7.    Application of Payments.** Lender may apply any payment made on account of the Obligations toward such of the Obligations, and in such order, as Lender may elect from time to time, whether or not such Obligations are otherwise secured, or due at the time of application.

**1.8.    Additional, Independent and Unsecured Obligations.** This Guaranty is a guaranty of payment and not of collection and the obligations of each Guarantor hereunder shall be in addition to and shall not limit or in any way affect the obligations of such Guarantor under any other existing or future guaranties unless said other guaranties are expressly modified in writing. This Guaranty is independent of the obligations of Borrower under the Note, the Mortgages and the other Loan Documents. Lender may bring a separate action to enforce the provisions hereof against each Guarantor without taking action against Borrower or any other party or joining Borrower or any other party as a party to such action.

**2.    REPRESENTATIONS AND WARRANTIES.** Each of the Guarantors hereby covenants, represents and warrants to Lender as follows:

I:\TCC\FirstBank&TrustCo\FlamingoWest\GuarantyPayment-003.doc

2

GUARANTYPAYMENT-003
FBTP000

Loan No. _____

**2.1.** **Review of Guaranty and Loan Documents.** Such Guarantor has reviewed, with the benefit of its legal counsel, each of the terms and conditions of this Guaranty and each of the other Loan Documents, including, without limitation, the Loan Agreement and the Note.

**2.2.** **Financial Benefit to Guarantor.** Such Guarantor is deriving a material financial benefit from the making of the Loan to Borrower.

**2.3.** **Organization; Authorization.** Each Guarantor which is not a natural person is duly organized, validly existing and in good standing under the laws of the State of its formation, and duly qualified and in good standing under the laws of each other State in which its activities require that it be qualified. Each Guarantor has executed and delivered this Guaranty pursuant to proper authority duly granted.

**2.4.** **Enforceability.** Each obligation under this Guaranty is legal, valid, binding and enforceable against each Guarantor in accordance with all of its terms and conditions, subject to general principals of equity and the effect of bankruptcy and other laws affecting the rights of creditors generally.

**2.5.** **Financial Statements.** The financial statements furnished on behalf of such Guarantor to Lender in connection with this Guaranty or the Loan Agreement are (i) true and complete in all material respects, (ii) have been prepared in accordance with generally accepted accounting principles consistently applied, and (iii) present fairly the financial condition of such Guarantor as of the respective dates thereof. No material adverse change has occurred in the financial condition of such Guarantor since such dates.

**2.6.** **No Existing Defaults and No Litigation.** Such Guarantor is not in default under any agreement with Lender, the effect of which default could materially adversely affect performance of its obligations under this Guaranty. There are no actions, suits or proceedings pending or, to the best of its knowledge, threatened against such Guarantor before any court or any other governmental authority of any kind which could materially adversely affect performance of its obligations under this Guaranty.

**2.7.** **Guaranty Will Cause No Violations of Law or Other Defaults.** Neither the execution and delivery of this Guaranty nor compliance with any and all of its terms and conditions will violate any presently existing law, regulation, order, writ, injunction or decree of any court or other governmental authority of any kind, or result in any default by such Guarantor under any other document or agreement of any kind.

**2.8.** **No Misstatements or Omissions.** This Guaranty does not contain any untrue statement of fact or omit to state any fact material to this Guaranty. Such Guarantor has no knowledge of any material fact concerning Borrower or the financial condition of Borrower that has not been disclosed to Lender in writing and might adversely affect Lender's determination to enter into the Loan Agreement.

**2.9.** **ERISA.** Such Guarantor is not an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended



Loan No. _____

from time to time ("ERISA"), to which ERISA applies and such Guarantor's assets do not constitute assets of any such plan.

**3.    COVENANTS, CONDITIONS AND AGREEMENTS.** Each of the Guarantors hereby covenants and agrees with Lender as follows:

**3.1.    Annual Financial Reports.** Within 120 days after the end of each fiscal year, beginning with the fiscal year which ends on December 31, of the year as of which this Guaranty is executed and delivered, such Guarantor shall deliver to Lender a copy of such Guarantor's balance sheet, income statement and statement of changes in financial position for such fiscal year. Each such annual report shall (i) include a schedule of all material contingent liabilities and all other notes and schedules relating thereto, (ii) be in a form reasonably satisfactory to Lender, (iii) be prepared in accordance with generally accepted accounting principles consistently applied, and (iv) be reviewed by independent certified public accountants satisfactory to Lender.

**3.2.    Semi-Annual Financial Reports.** Within 90 days after the end of the second quarter of each fiscal year beginning with the second quarter of **[the year after]** the year as of which this Guaranty is executed and delivered, such Guarantor shall deliver to Lender true and complete copies of such Guarantor's unaudited balance sheet, income statement and statement of changes in financial position for the first two quarters. Each such semi-annual report shall be in a form satisfactory to Lender and shall be accompanied by a schedule of all material contingent liabilities and all other notes and schedules relating thereto and by a certification by such Guarantor to Lender (made by the chief financial officer in the case of any corporate Guarantor) that such report (i) has been prepared in accordance with generally accepted accounting principles consistently applied provided that such report need not be prepared in accordance with generally accepted accounting principles consistently applied so long as such report is in substantially the same form as the financial statements and reports delivered to Lender prior to Lender's execution of the Loan Agreement, (ii) presents fairly the financial condition of such Guarantor as of the respective date thereof, and (iii) shows all direct and contingent material liabilities of such Guarantor as of such dates. In addition, such Guarantor shall deliver to Lender from time to time such other financial statements and information as Lender may reasonably request.

**3.3.    Transfers, Sales, Etc.** Such Guarantor shall not sell, lease, transfer, convey or assign any of its assets, unless (i) such sale, lease, transfer, conveyance or assignment is of a non-material asset of such Guarantor or (ii) such sale, lease, transfer, conveyance or assignment is performed in the ordinary course of its business consistent with past practices, and will not have a material adverse effect on the business or financial condition of such Guarantor.

**3.4.    Rescinded or Returned Payments.** If at any time any part of any payment previously applied by Lender to any of the Obligations is rescinded or returned by Lender for any reason, including, without limitation, the insolvency, bankruptcy or reorganization of Borrower or any other party, such Obligations shall be deemed to have continued in existence to the extent that such payment is rescinded or returned, and this Guaranty

Loan No. _____

shall be reinstated as to such Obligations as though such prior application by Lender had not been made.

   **3.5.   Certain Permitted Actions of Lender.** Lender may, from time to time, at its option and without notice to any Guarantor, take any or all of the following actions in any combination without in any way affecting the obligations of any Guarantor: (i) obtain a security interest in any property to secure any of the Obligations or any obligation hereunder; (ii) obtain the primary or secondary obligation of any additional obligor or obligors with respect to any of the Obligations; (iii) extend, modify, subordinate, exchange or release any of the Obligations; (iv) modify, subordinate, exchange or release its security interest in all or any part of any property securing any of the Obligations or any obligation hereunder, or extend, modify, subordinate, exchange or release any obligations of any obligor with respect to any such property; (v) alter the manner or place of payment of the Obligations; (vi) enforce this Guaranty against any Guarantor for payment of any of the Obligations, whether or not Lender shall have proceeded against Borrower or any other Guarantor or any other party primarily or secondarily obligated with respect to any of the Obligations, or resorted to or exhausted any other remedy or any other security or collateral; and (vii) foreclose on, take possession of, or sell any of the collateral or security for the Obligations or enforce any other rights under any of the Loan Documents.

   **3.6.   Lender's Option to Release Any Guarantor.** Lender may, from time to time, at its option, release any Guarantor from any of its obligations hereunder or release Borrower or any other obligor from any of the Obligations without notice to any other Guarantor or any other party and without in any way releasing or affecting the liability of any other Guarantor.

   **3.7.   Application of Payments.** Lender may apply any payment made on account of the Obligations toward such of the Obligations, and in such order, as Lender may elect from time to time, whether or not such Obligations are guaranteed hereby, otherwise secured, or due at the time of application.

   **3.8.   Subordination.** Such Guarantor hereby subordinates, and shall cause any Affiliate of such Guarantor to subordinate, any claims or liens of such Guarantor or any of its Affiliates against Borrower of any kind (including, without limitation, any right of such Guarantor to a return of any capital contributed to Borrower) to all of the Obligations and to any other claims or liens of Lender against Borrower or any of the property of Borrower. Upon any notice by Lender to Borrower of any default under any Loan Document, such Guarantor and its Affiliates shall enforce any of their claims or liens as trustee for Lender, and shall cause any receipts to be paid over to Lender on account of the Obligations without affecting in any manner the liability of such Guarantor under this Guaranty, except to the extent of such payment. As long as no such notice of default has occurred, such Guarantor and its Affiliates may apply to their own accounts payments made by Borrower.

   **3.9.   Certain Events Not Affecting Obligations of Any Guarantor.** The obligations of such Guarantor hereunder shall not be affected by any of the following: (i) the release or discharge of Borrower in any creditors', receivership, bankruptcy, reorganization,

Loan No. _____

insolvency, or other proceedings; (ii) the rejection or disaffirmance in any such proceeding of any of the Obligations; (iii) the impairment or modification of any of the Obligations, or of any remedy for the enforcement thereof, or of the estate of Borrower in bankruptcy, resulting from any present or future federal or state bankruptcy law or any other law of any kind or from the decision or order of any court or other governmental authority; (iv) any disability or defense of Borrower; (v) the cessation of the liability of Borrower for any cause whatsoever; (vi) any sale, assignment, transfer or other conveyance (including, without limitation, any conveyance in lieu of foreclosure or any collateral sale pursuant to the Uniform Commercial Code) of any of the security for any of the Obligations, regardless of the amount received by Lender in connection therewith; or (vii) any disability or defense of any kind now existing of such Guarantor with respect to any provision of this Guaranty.

   **3.10. No Obligation of Lender Regarding Security Interest**. Lender shall have no obligation to obtain, perfect or retain a security interest in any property to secure any of the Obligations or this Guaranty (including, without limitation, any mortgage or security interest contemplated by any of the Loan Documents), or to protect or insure any such property.

   **3.11. Filing of Certain Claims**. Such Guarantor shall promptly file in any bankruptcy or other proceeding in which the filing of claims is required by law all claims and proofs of such claims which such Guarantor may have against Borrower, and shall collaterally assign to Lender or its nominee all rights of such Guarantor thereunder. In all such cases, any party authorized to pay such claim shall pay to Lender or its nominee the full amount thereof.

   **3.12. ERISA**. For so long as this Guaranty shall be continuing, such Guarantor hereby covenants to Lender, that, for the duration of the term of this Guaranty, such Guarantor shall not be an "employee benefit plan" within the meaning of Section 3(3) of ERISA to which ERISA applies and such Guarantor's assets shall not constitute assets of any such plan.

   **3.13. Performance by One Guarantor Deemed Performance by All**. Each Guarantor hereby authorizes any other Guarantor to perform any obligation under this Guaranty, and Lender may rely on any such performance as if it had been made by all Guarantors.

   **3.14. Waivers by Guarantors**. Each of the Guarantors hereby expressly waives each of the following: (i) notice of the acceptance by Lender of this Guaranty, notice of the existence, creation or non-payment of any of the Obligations, presentment, demand, notice of dishonor, protest, notice of protest, and all other notices except any specifically required by this Guaranty or required by law; (ii) any obligation Lender may have to disclose to such Guarantor any facts Lender now or hereafter may know or have reasonably available to it regarding Borrower or the financial condition of Borrower, whether or not Lender has a reasonable opportunity to communicate such facts or has reason to believe that any such facts are unknown to such Guarantor or materially increase the risk to such Guarantor beyond the risk such Guarantor intends to assume hereunder; such Guarantor shall be fully responsible for keeping informed of the financial condition of Borrower and of all other circumstances bearing on the risk of non-payment or non-performance of the Obligations; (iii) all diligence in collection of any of the Obligations, any obligation hereunder, or any guaranty or other security for any of the foregoing; (iv) the benefit of all appraisement, valuation, marshaling, forbearance, stay,

Loan No. _____

extension, redemption, homestead, exemption and moratorium laws now or hereafter in effect; (v) any defense based on the incapacity, lack of authority, death or disability of any other person or entity or the failure of Lender to file or enforce a claim against the estate of any person or entity in any administrative, bankruptcy or other proceeding; (vi) any defense based on an election of remedies by Lender, whether or not such election may affect in any way the recourse, subrogation or other rights of such Guarantor against Borrower or any other person in connection with the Obligations; (vii) any defense based on the failure of Lender to (A) provide notice to such Guarantor of a sale or other disposition (including any collateral sale pursuant to the Uniform Commercial Code, as adopted in Illinois) of any of the security for any of the Obligations, or (B) conduct such a sale or disposition in a commercially reasonable manner; (viii) any defense based on the negligence of Lender in administering the Loan, or taking or failing to take any action in connection therewith, or based on any claim that Lender failed to act both in good faith and in a commercially reasonable manner; and (ix) any rights arising because of such Guarantor's payment or performance of any of the Obligations (A) against Borrower, by way of subrogation of the rights of Lender or otherwise, or (B) against any other Guarantor or any other party obligated to pay or perform any of the Obligations, by way of contribution or reimbursement or otherwise; provided, that at such time, if ever, as the Obligations are paid in full (as determined by Lender in Lender's reasonable discretion), the waiver set forth in this **Section 3.14(ix)** shall be of no further force or effect.

## 4. DEFAULT OF GUARANTORS WHEN BORROWER IS NOT IN DEFAULT.

**4.1.** **Events of Default.** The occurrence of any of the following, regardless of whether or not any performance or payment of any of the Obligations shall then be due, shall be a default under this Guaranty: (i) the death, incompetency, dissolution, liquidation, bankruptcy or insolvency of any Guarantor, the inability of any Guarantor to pay its debts generally as they become due, or a general assignment by any Guarantor for the benefit of creditors; (ii) any application for or consent to the appointment of a trustee, receiver or other custodian for any Guarantor or any assets or property of any of them, or the institution of any proceeding by any Guarantor under any federal or state laws providing for the relief of debtors or otherwise alleging that any Guarantor is insolvent, bankrupt or unable to pay its debts generally as they become due; (iii) the institution of any proceeding against any Guarantor under any federal or state laws providing for the relief of debtors or otherwise alleging that any Guarantor is insolvent, bankrupt or unable to pay its debts generally as they become due which is not vacated within 60 days of filing; (iv) any Guarantor is in breach of any of its representations and warranties contained herein and such breach or failure continues for a period of 30 days after notice thereof from Lender to Guarantor; or (v) any Guarantor is in breach of or fails to perform any of its covenants, agreements and obligations set forth herein and such breach or failure continues for a period of 30 days after notice thereof from Lender to Guarantor.

**4.2.** **Cure of Certain Defaults.** Upon the occurrence of any of the events described in clauses (i), (ii), (iii) or (iv) of **Section 4.1** hereof, other than any breach described in clause (iv) relating to **Section 2.9** or **Section 3.12** hereof, Lender may, at its option, permit the Guarantor to whom such event applies (or, in the case of the death of a Guarantor, the deceased Guarantor's estate) to cure the resulting default by delivering to Lender within 30 days from the

Loan No. _____

occurrence of such event, in the case of any event described in said clause (i), (ii) or (iii), or within 30 days from the date notice is given to the Guarantor by Lender, in the case of any event described in said clause (iv) (except events which relate to **Section 2.9** or **Section 3.12** hereof as aforesaid), Cash Collateral (as hereinafter defined) in an amount sufficient to pay all of the Obligations if they were then due and payable.  As used herein, **"Cash Collateral"** shall mean, in Lender's sole discretion, either cash or any combination of cash and letters of credit or other cash equivalents or other security satisfactory in amount and all other respects to Lender.  Lender shall invest all such cash or cash equivalents in United States treasury obligations as additional security for payment of the Obligations, and "Cash Collateral" shall include any interest which may accrue thereon.  Lender may apply any Cash Collateral to the payment of any of the Obligations not paid in full when due and will remit to the appropriate Guarantor any excess remaining after the full performance of and payment in full of all of the Obligations.

5.    **MISCELLANEOUS.**

5.1.    **Application of GAAP.**  Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purpose of this Guaranty, the same shall be done in accordance with generally accepted accounting principles, to the extent applicable, except where such principles are inconsistent with the requirements of this Guaranty.

5.2.    **Joint and Several Obligations; Successors and Assigns.**  All obligations under this Guaranty are joint and several to each of the Guarantors and any other party which hereafter guarantees any portion of the Obligations, and shall be binding upon each of them and their respective heirs, legal representatives, successors and assigns.

5.3.    **Assignment by Lender.**  Lender may from time to time, without notice to any Guarantor, assign or transfer any interest in any of the Obligations by loan participation or otherwise, and notwithstanding such assignment or transfer, such Obligations shall remain Obligations for purposes of this Guaranty.  Each immediate and successive assignee or transferee of any interest in any of the Obligations and this Guaranty shall, to the extent of such interest, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were Lender.  Lender may deliver to any such assignee or transferee any financial statements delivered by any Guarantor in connection with this Guaranty.

5.4.    **No Exculpation.**  No exculpatory, "non-recourse," "limited recourse," or other language contained in any other Loan Document or in any other document shall in any way prevent Lender from, or otherwise limit Lender in, enforcing this Guaranty against any Guarantor personally.

5.5.    **Legal Tender of United States.**  All payments hereunder shall be made in coin or currency which at the time of payment is legal tender in the United States of America for public and private debts.

5.6.    **Time of Essence.**  Time is of the essence of this Guaranty.

Loan No. ____

5.7.  **Definitions; Captions.**  With respect to any reference in this Guaranty to any defined term, (i) if such defined term refers to a person, or a trust, corporation, partnership or other entity, then it shall also mean all heirs, personal representatives, successors and assigns of such person or entity, and (ii) if such defined term refers to a document, instrument or agreement, then it shall also include any replacement, extension or other modification thereof. Captions contained in this Guaranty in no way define, limit or extend the scope or intent of their respective provisions.

5.8.  **Notices.**  Any notices that Lender or any Guarantor may give hereunder shall be deemed given if in writing and if delivered personally, or if mailed, postage prepaid, by United States registered or certified mail, return receipt requested, or if delivered by a responsible overnight courier, addressed:

| | |
|---|---|
| if to Guarantor: | 3900 SW 30th Avenue<br>Suite Three<br>Fort Lauderdale, FL 33312 |
| with a copy to: | Elizabeth Brandon-Brown, Esq.<br>Law Offices of Brandon-Brown P.L.<br>9045 LaFontana Blvd., Suite 101<br>Boca Raton, Florida 33434 |
| in the case of Lender to: | First Bank and Trust Company of Illinois<br>300 East Northwest Highway<br>Palatine, Illinois 60067<br>Attn:   C. Richard Schuler |
| with a copy to: | Cobb & Ebin P.A.<br>825 Brickell Bay Drive, Suite 1648<br>Miami, FL  33131-2920<br>Attn:  Thomas C. Cobb, Esq. |

or to such other address or addresses as the party to be given notice may have furnished in writing to the party seeking or desiring to give notice, as a place for the giving of notice, provided that no change in address shall be effective until seven days after being given to the other party in the manner provided for above.  Any notice given in accordance with the foregoing shall be deemed given when delivered personally or, if mailed, three business days after it shall have been deposited in the United States mails as aforesaid or, if sent by overnight courier, the business day following the date of delivery to such courier.  Nothing in this notice provision shall be construed as a requirement that Lender give any notice under this Guaranty.

5.9.  **Entire Agreement.** This Guaranty constitutes the entire agreement of the Guarantors for the benefit of Lender and supersedes any prior agreements with respect to the subject matter hereof.

I:\TCC\FirstBank&TrustCo\FlamingoWest\GuarantyPayment-003.doc

9

GUARANTYPAYMENT-003
FBTP000

Loan No. _____

**5.10. No Modification Without Writing**. This Guaranty may not be terminated or modified in any way nor can any right of Lender or any obligation of any Guarantor be waived or modified, except by a writing signed by Lender and such Guarantor.

**5.11. Independent Obligations**. The obligations of each Guarantor hereunder are independent of the obligations of Borrower and each other Guarantor. In the event of any default hereunder, Lender may institute a separate action against any Guarantor with or without joining or instituting a separate action against Borrower or any other Guarantor or other obligor.

**5.12. Documentation**. All documents and other matters required by any of the provisions of this Guaranty to be submitted or furnished to Lender shall be in form and substance satisfactory to Lender.

**5.13. Additional Assurances**. Each Guarantor agrees that, at any time or from time to time, upon the written request of Lender, such Guarantor will execute all such further documents and do all such other acts and things as Lender may reasonably request to effectuate the purposes of this Guaranty.

**5.14. Choice of Law**. This Guaranty shall be governed by and construed in accordance with the internal laws of the State of Illinois. Guarantors acknowledge that Lender's principal office is located in Chicago, Illinois and that Lender may be irreparably harmed if required to institute or defend any action in any jurisdiction other than the Northern District of Illinois or Cook County, Illinois. Therefore, each of the Guarantors irrevocably (i) agrees that any suit, action or other legal proceeding relating to this Guaranty may be brought only in the Circuit Court of Cook County or in the Northern District of Illinois, at Lender's option, (ii) consents to the jurisdiction of each such court in any such suit, action or proceeding, and (iii) waives any objection which such Guarantor may have to the laying of venue in any such suit, action or proceeding in either such court. Nothing herein shall be deemed to limit any rights, powers or privileges which Lender may have pursuant to any law of the United States of America or any rule, regulation or order of any department or agency thereof and nothing herein shall be deemed to make unlawful any transaction or conduct by Lender which is lawful pursuant to, or which is permitted by, any of the foregoing.

**5.15. No Third Party Beneficiary**. This Guaranty is made for the sole benefit of Guarantors and Lender, and no other person shall be deemed to have any privity of contract hereunder nor any right to rely hereon to any extent or for any purpose whatsoever, nor shall any other person have any right of action of any kind hereon or be deemed to be a third party beneficiary hereunder.

**5.16. Interpretation**. All references herein to a party's best knowledge shall be deemed to mean the best knowledge of such party based on all appropriate and thorough inquiry. Unless specified to the contrary herein, references herein to an exercise of discretion or judgment by Lender, to the making of a determination or designation by Lender, to the application of Lender's discretion or opinion, to the granting or withholding of Lender's consent or approval, to the consideration of whether a matter or thing is satisfactory or acceptable to Lender, or otherwise involving the decision making of Lender, shall be deemed to mean that Lender shall decide unilaterally using its sole and absolute discretion or judgment. The terms "herein,"

I:\TCC\FirstBank&TrustCo\FlamingoWest\GuarantyPayment-003.doc

10

GUARANTYPAYMENT-003
FBTP000

Loan No. _____

"hereof," "hereunder" and any other similar terms used herein shall be deemed to refer to this Agreement in its entirety. Any reference contained herein to attorneys' fees and expenses shall be deemed to be to reasonable fees and expenses and to include all reasonable fees and expenses of in-house or staff attorneys and the reasonable fees and expenses of any other experts or consultants.

      **5.17. No Waiver.** No waiver of any term, provision, condition, covenant or agreement herein contained shall be effective unless set forth in a writing signed by Lender, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising by Lender of any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof, or the exercise of any other right or remedy provided by law. No notice or demand on any Guarantor in any case shall, in itself, entitle such Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, expressed or implied, by Lender to or of any breach or default by any Guarantor in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of such Guarantor hereunder. Failure on the part of Lender to complain of any acts or failure to act or to declare an Event of Default, irrespective of how long such failure continues, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers or remedies on account of any breach or default by such Guarantor.

      **5.18. Severability.** Any provision of this Guaranty which is unenforceable or invalid or contrary to law, or the inclusion of which would adversely affect the validity, legality or enforcement of this Guaranty, shall be of no effect and, in such case, all the remaining terms and provisions of this Guaranty shall subsist and be fully effective according to the tenor of this Guaranty the same as though any such invalid portion had never been included herein. Notwithstanding any of the foregoing to the contrary, if any provisions of this Agreement or the application thereof are held invalid or unenforceable only as to particular persons or situations, the remainder of this Guaranty, and the application of such provision to persons or situations other than those to which it shall have been held invalid or unenforceable, shall not be affected thereby, but shall continue valid and enforceable to the fullest extent permitted by law.

      **5.19. Cumulative.** The obligations of each Guarantor hereunder are in addition to any other obligations it may now or hereafter have to Lender, and shall not be affected in any way by the delivery to Lender by any of the Guarantors or any other guarantor of any other guaranty. All rights and remedies of Lender and all obligations of the Guarantors under this Guaranty are cumulative; without limitation, Lender's exercise of its right to receive Cash Collateral from one Guarantor hereof shall in no way limit any right or remedy of Lender against any other Guarantor. In addition, Lender shall have all rights and remedies available to it in law or equity for the enforcement of this Guaranty.

      **5.20. One Guarantor.** If this Guaranty is made by only one Guarantor, then all references in this Guaranty to the "Guarantors," "each of the Guarantors," "any Guarantor," "any

Loan No. _____

of the Guarantors", "such Guarantor" or any similar reference shall be deemed to mean solely the Guarantor whose signature is set forth below.

      **5.21.** <u>**WAIVER OF JURY TRIAL**</u>.    EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS THAT SUCH GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN ANY WAY IN CONNECTION WITH THIS GUARANTY OR ANY OR THE OTHER LOAN DOCUMENTS EXECUTED BY SUCH GUARANTOR, OR ANY OTHER STATEMENTS OR ACTIONS OF LENDER.    EACH GUARANTOR ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THE LOAN AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS IT EXECUTES, AND THAT THIS WAIVER SHALL BE EFFECTIVE AS TO EACH OF THE OTHER LOAN DOCUMENTS TO WHICH SUCH GUARANTOR IS A PARTY AS IF FULLY INCORPORATED THEREIN.

      [THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Loan No. _____

**IN WITNESS WHEREOF,** the parties hereto have caused this Guaranty to be executed by their duly authorized representatives as of the date first above written.

WITNESSES:                                  GUARANTORS:

Print Name: Garrett Ellis                   · Kenneth E. Richardson

Print Name:_____

STATE OF FLORIDA          )
                          ) ss
COUNTY OF_____)

This instrument was acknowledged before me on October __, 2006 by Kenneth E. Richardson who is [  ] personally known to me, or [  ] produced a _____ drivers license as identification.

_____
NOTARY PUBLIC, STATE OF FLORIDA

_____
(Print, Type of Stamp Commissions Name of Notary Public)
Commission No._____

My Commission Expires:_____
                        (SEAL)

Loan No. _____

Print Name: Garrett Ellis

Michael Annecca

Print Name:_____

STATE OF FLORIDA     )
                           ) ss

COUNTY OF_____)

      This instrument was acknowledged before me on October __, 2006 by Michael Annecca who is [   ] personally known to me, or [   ] produced a _____ drivers license as identification.

NOTARY PUBLIC, STATE OF FLORIDA

(Print, Type of Stamp Commissions Name of Notary Public)
Commission No._____

      My Commission Expires:_____
                                (SEAL)

08CV4987
JUDGE NORDBERG
MAGISTRATE JUDGE ASHMAN
EDA

# EXHIBIT 4

## BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

200 WEST MADISON STREET, SUITE 3900
CHICAGO, ILLINOIS 60606
Telephone (312) 984-3100
Facsimile (312) 984-3150

July 10, 2008

**VIA OVERNIGHT DELIVERY**

Michael Annecca
3900 SW 30th Avenue
Suite Three
Fort Lauderdale, Florida 33312

Re:    Guaranty of Payment and Performance (the "**Payment Guaranty**") dated October 2006 made by Kenneth E. Richardson and Michael Annecca ("**Guarantor**") in favor of First Bank and Trust Company of Illinois, an Illinois state commercial bank ("**Lender**")

Dear Mr. Annecca:

Capitalized terms used but not defined herein shall have the respective meanings given to them in the Payment Guaranty.

This firm represents Lender in connection with the Loan.

Lender hereby gives Guarantor notice that the Loan has matured. As provided in Section 2.11 of the Loan Agreement, the Maturity Date of the Loan was April 10, 2008. Section 2.6 of the Loan Agreement provides that "On the Maturity Date, or any earlier acceleration of it, all sums due and owing under this Agreement and the other Loan Documents shall be repaid in full." Lender hereby demands that Guarantor comply with Section 1.1 of the Payment Guaranty, which provides that Guarantor shall "pay and perform when due the Obligations," with such Obligations including, without limitation, pursuant to Section 1.2 of the Payment Guaranty, "all monetary obligations of Borrower to Lender of any kind whatsoever. . . , including, without limitation, the obligation to pay the principal amount of each of the Note when due thereunder and the obligation to pay interest under each of the Note, including any interest at the post-maturity or default rate. . ." Without limitation of the foregoing, Lender also hereby demands Guarantor pay all Expenses as defined in Section 1.3 of the Payment Guaranty. As of July 7, 2008, principal, accrued and unpaid interest and default interest, late charges, legal fees and other expenses in the amount of $8,202,889.98 are due and owing to Lender.

Nothing contained in this letter is intended to limit, nor shall it be deemed to limit or in any way affect, any of Lender's rights or remedies under the Payment Guaranty or any Loan Document with respect to any current or future default or Event of Default under the Payment Guaranty or any or all of the Loan Documents, and shall not be deemed to provide any additional cure period to Guarantor or Borrower beyond any cure period specified in the Payment Guaranty or any Loan Document. Nothing contained herein, nor any failure by Lender to exercise any of

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

July 10, 2008
Page 2

its rights or remedies under the Payment Guaranty or any or all of the Loan Documents with respect to any existing or future default or Event of Default shall be deemed to constitute, nor is it intended to constitute, a waiver of any existing or future default or Event of Default under the Payment Guaranty or any or all of the Loan Documents or a waiver of Lender's rights to pursue any and all of its rights and remedies under the Payment Guaranty or any Loan Documents at any time without further notice to Borrower or Guarantor. Any listing of defaults herein (or the facts or circumstances related thereto) is not intended to be, nor shall it be construed as, a complete listing of all defaults (or the facts or circumstances related thereto) or a waiver of any unlisted defaults. In addition, any act or omission by Lender with respect to the Loan or the Payment Guaranty prior to or following the date hereof shall be without prejudice to Lender's rights and remedies with respect to each such default. All rights and remedies of Lender, whether at law or in equity, are expressly reserved.

Very truly yours,

BARACK FERRAZZANO KIRSCHBAUM &
NAGELBERG LLP, attorneys for Lender

By
    Howard J. Kirschbaum, a Partner

cc:
Elizabeth Brandon-Brown, Esq.
Law Offices of Brandon-Brown P.C.
9045 LaFontana Blvd., Suite 101
Boca Raton, Florida 33434
(via overnight delivery)

Kenneth E. Richardson
3900 SW 30th Avenue
Suite Three
Fort Lauderdale, Florida 33312

# BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

200 WEST MADISON STREET, SUITE 3900
CHICAGO, ILLINOIS 60606
Telephone (312) 984-3100
Facsimile (312) 984-3150

July 10, 2008

## VIA OVERNIGHT DELIVERY

Kenneth E. Richardson
3900 SW 30th Avenue
Suite Three
Fort Lauderdale, Florida 33312

     Re:    Guaranty of Payment and Performance (the "**Payment Guaranty**") dated October 2006 made by Kenneth E. Richardson ("**Guarantor**") and Michael Annecca in favor of First Bank and Trust Company of Illinois, an Illinois state commercial bank ("**Lender**")

Dear Mr. Richardson:

Capitalized terms used but not defined herein shall have the respective meanings given to them in the Payment Guaranty.

This firm represents Lender in connection with the Loan.

Lender hereby gives Guarantor notice that the Loan has matured. As provided in Section 2.11 of the Loan Agreement, the Maturity Date of the Loan was April 10, 2008. Section 2.6 of the Loan Agreement provides that "On the Maturity Date, or any earlier acceleration of it, all sums due and owing under this Agreement and the other Loan Documents shall be repaid in full." Lender hereby demands that Guarantor comply with Section 1.1 of the Payment Guaranty, which provides that Guarantor shall "pay and perform when due the Obligations," with such Obligations including, without limitation, pursuant to Section 1.2 of the Payment Guaranty, "all monetary obligations of Borrower to Lender of any kind whatsoever. . . , including, without limitation, the obligation to pay the principal amount of each of the Note when due thereunder and the obligation to pay interest under each of the Note, including any interest at the post-maturity or default rate. . ." Without limitation of the foregoing, Lender also hereby demands Guarantor pay all Expenses as defined in Section 1.3 of the Payment Guaranty. As of July 7, 2008, principal, accrued and unpaid interest and default interest, late charges, legal fees and other expenses in the amount of $8,202,889.98 are due and owing to Lender.

Nothing contained in this letter is intended to limit, nor shall it be deemed to limit or in any way affect, any of Lender's rights or remedies under the Payment Guaranty or any Loan Document with respect to any current or future default or Event of Default under the Payment Guaranty or any or all of the Loan Documents, and shall not be deemed to provide any additional cure period to Guarantor or Borrower beyond any cure period specified in the Payment Guaranty or any Loan Document. Nothing contained herein, nor any failure by Lender to exercise any of

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

July 10, 2008
Page 2

its rights or remedies under the Payment Guaranty or any or all of the Loan Documents with respect to any existing or future default or Event of Default shall be deemed to constitute, nor is it intended to constitute, a waiver of any existing or future default or Event of Default under the Payment Guaranty or any or all of the Loan Documents or a waiver of Lender's rights to pursue any and all of its rights and remedies under the Payment Guaranty or any Loan Documents at any time without further notice to Borrower or Guarantor.  Any listing of defaults herein (or the facts or circumstances related thereto) is not intended to be, nor shall it be construed as, a complete listing of all defaults (or the facts or circumstances related thereto) or a waiver of any unlisted defaults.  In addition, any act or omission by Lender with respect to the Loan or the Payment Guaranty prior to or following the date hereof shall be without prejudice to Lender's rights and remedies with respect to each such default.  All rights and remedies of Lender, whether at law or in equity, are expressly reserved.

Very truly yours,

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP, attorneys for Lender

By:_____
    Howard J. Kirschbaum, a Partner

cc:
Elizabeth Brandon-Brown, Esq.
Law Offices of Brandon-Brown P.C.
9045 LaFontana Blvd., Suite 101
Boca Raton, Florida  33434
(via overnight delivery)

Michael Annecca
3900 SW 30th Avenue
Suite Three
Fort Lauderdale, Florida  33312